IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| TECHNOLOGY AND SUPPLY MANAGEMENT, LLC | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 1:16 CV 303 AJT / MSN |
| JOHNSON CONTROLS BUILDING AUTOMATION SYSTEMS, LLC, | ) ) ) | |
| JOHNSON CONTROLS, INC., | ) ) ) | |
| and | ) ) ) | |
| JOHNSON CONTROLS FEDERAL SYSTEMS, INC. | ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Technology and Supply Management, LLC ("TaSM" or "Plaintiff") for its complaint against Johnson Controls Building Automation Systems, LLC ("JCBAS"), Johnson Controls, Inc. ("JCI"), and Johnson Controls Federal Systems, Inc. ("JCFS") (collectively the "Defendants"), alleges as follows:

### Parties

1.    TaSM is a Service-Disabled Veteran-Owned Small Business and a Virginia limited liability company with its principal place of business located at 3877 Fairfax Road, Suite 110N, Fairfax, VA 22030.

2.      Upon information and belief, JCBAS is a Delaware limited liability company with its principal place of business located at 50 W. Watkins Mill Road, Suite B, Gaithersburg, MD 20878, and is a subsidiary of JCI.

3.      Upon information and belief, JCI is a Wisconsin corporation with its principal place of business located at 5757 N. Green Bay Avenue, Milwaukee, WI  53209, and is the parent company of JCBAS and JCFS.

4.      Upon information and belief, JCFS is a Delaware corporation with its principal place of business located at 50 West Watkins Mill Road, Suite B, Gaithersburg, MD  20878, and is a subsidiary of JCI.

## Personal Jurisdiction

5.      This Court has personal jurisdiction over JCBAS because JCBAS has purposefully availed itself of the benefits and protections of the Commonwealth of Virginia in connection with the contract between the parties and other acts and omissions giving rise to this dispute. JCBAS had a substantial and continuing relationship with TaSM in Virginia. JCBAS also subcontracted to Virginia companies for a portion of the work required by the contract at issue, frequently traveled to Dublin, Virginia for business matters relating to the contract at issue, and regularly contacted TaSM in Fairfax, Virginia.

6.      This Court further has personal jurisdiction over JCBAS because the contract giving rise to this dispute contains a forum selection clause specifically naming the Eastern District of Virginia (Alexandria Division) as the forum with jurisdiction over "any dispute" arising out of the agreement.

7.      This Court has personal jurisdiction over JCI because JCI has purposely availed itself of the benefits and protections of the Commonwealth of Virginia in connection with the

2

contract and other acts and omissions giving rise to this dispute. JCI has a substantial and continuing relationship with TaSM in Virginia. JCI personnel have been heavily involved with the contract at issue, having frequently traveled to Dublin, Virginia for business matters relating to that contract and regularly contacted TaSM in Fairfax, Virginia.

8.      This Court has personal jurisdiction over JCFS because JCFS has purposely availed itself of the benefits and protections of the Commonwealth of Virginia in connection with the contract and other acts and omissions giving rise to this dispute. JCFS has a substantial and continuing relationship with TaSM in Virginia. JCFS personnel have been heavily involved with the contract at issue, having frequently traveled to Dublin, Virginia for business matters relating to that contract and regularly contacted TaSM in Fairfax, Virginia.

### Subject Matter Jurisdiction

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy is in excess of $75,000 exclusive of interest and costs, and this action is between citizens of different states.

### Venue

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c), because a substantial part of the events giving rise to the claims set forth herein occurred in this judicial district, the Defendants are deemed to reside in this judicial district, and the agreement between JCBAS and TaSM giving rise to this dispute contains a forum selection clause specifying venue in this judicial district.

### TaSM's Prime Contract with the Army

11.      On or about October 12, 2012, the U.S. Department of the Army ("Army") issued Request for Proposals No. W15QKN-12-R-0070 ("RFP"), seeking goods and services in support

3

of the Army's Kuwait Energy Efficiency Project ("KEEP"). The objective of the RFP was to procure up to 280 energy efficient, rigid-walled, relocatable shelters for Camp Buehring, Kuwait.

12.     These shelters were meant to replace the soft-walled Temper Tents commonly used by the Army. The KEEP shelters were to provide the Army with cost savings on fuel for heating and cooling and allow the soldiers to be housed in a more comfortable environment, as temperatures in Kuwait regularly reach over 120 degrees Fahrenheit during the summer.

13.     The RFP was issued as a small business set-aside, meaning a contract under the RFP could be awarded only to a company that qualified as a small business under federal regulations. TaSM qualifies as a small business under federal procurement regulations, but the Defendants do not.

14.     Prior to the release of the RFP, JCBAS was positioning itself to pursue the KEEP award as the prime contractor. When the RFP was issued as a small business set-aside, however, JCBAS was not able to compete for the work as a prime contractor.

15.     JCBAS approached TaSM with the idea of JCBAS serving as a subcontractor on TaSM's team, with TaSM to be the prime contractor.

16.     JCBAS's proposal to TaSM promised that JCBAS and Premium Steel Building Systems Incorporated ("Premium Steel") would write the technical volume to be included in TaSM's response to the RFP, and that Premium Steel and ThermaSteel Corporation ("ThermaSteel") would support the KEEP effort as second-tier subcontractors.

17.     In 2012, ThermaSteel was the sole U.S. manufacturer of the specific type of energy efficient panels to be used in the KEEP shelters.

18.     As of 2012, Premium Steel had substantial experience manufacturing and installing energy efficient buildings of the type required for the KEEP effort.

4

19.   TaSM agreed to team with JCBAS largely because of JCBAS's existing relationships with Premium Steel and ThermaSteel.

20.   On or before the Army's November 26, 2012 deadline, TaSM and fifteen other small businesses submitted proposals in response to the RFP.

21.   TaSM's proposal contemplated shelters constructed with structurally insulated panels, which contain a core made of high-density expanded polystyrene ("EPS") sandwiched by metal skins. These panels would serve as both the structural building blocks of the shelters as well as the insulation, providing significant benefits to the Army and its soldiers in the form of comfort, protection, and cost savings.

22.   Based on an evaluation of technical, price, and past performance factors, the Army selected TaSM's proposal as the best of the sixteen submissions and awarded the KEEP contract to TaSM on or about March 15, 2013.

23.   Shortly thereafter, two of the unsuccessful offerors protested the Army's evaluation and award. The Army decided to take corrective action in response to the protests, canceling TaSM's award and amending the solicitation on May 23, 2013, to permit submission of revised proposals from each of the sixteen original offerors.

24.   TaSM and eleven other small businesses timely submitted revised proposals in response to the amended RFP.

25.   After resolving two further protests, on or about September 27, 2013, the Army again selected TaSM's proposal based on an evaluation of technical, price and past performance factors. Accordingly, the Army awarded to TaSM Contract No. W15QKN-D-0113 ("Prime Contract"). The Prime Contract had a total ceiling value of $29,429,017, with performance to run through September 25, 2015.

26.     At the same time as the Prime Contract, the Army issued Delivery Order 0001 under the Prime Contract. Delivery Order 0001 was to procure seventy-two (72) two-story KEEP shelters for Camp Buehring, Kuwait, and had a total value of $14,880,593.52.

27.     Delivery Order 0001 included the complete installation of the seventy-two KEEP shelters at Camp Buehring, requiring TaSM to provide transportation of the shelters from production facilities to Camp Buehring, to erect the shelters at Camp Buehring, and to provide all planning, coordination, surveying, transportation, setup, integration, inspection, warranty, and document implementation in accordance with the Prime Contract requirements.

28.     In addition to the seventy-two KEEP shelters, Delivery Order 0001 required TaSM to provide a Shelter Guide, Shelter Specifications, and Electrical Components Documentation. These required documents were to include information such as details on the assembly and disassembly process, details on the packaging and shipping process, information on spare parts, technical details, schematics, and diagrams of the structure, as well as information regarding the electrical equipment used in the structures.

29.     Delivery Order 0001 established a period of performance of 240 days from the issuance of the task order.

30.     On October 16, 2013, TaSM received notice from the Army that yet another protest had been filed. The Army instructed TaSM to stop work on the Prime Contract and Delivery Order 0001 immediately.

31.     On January 13, 2014, TaSM received notice from the Army that it was authorized to start work under all contract line items on Delivery Order 0001 and TaSM immediately resumed performance.

6

## TaSM's Subcontract with JCBAS

32.    On February 11, 2014, TaSM and JCBAS executed a subcontract agreement ("Subcontract") relating to the work required by the Prime Contract. A true and correct copy of the Subcontract is attached hereto as **Exhibit A** and incorporated herein by reference.

33.    As contemplated during the proposal process, JCBAS used Premium Steel and ThermaSteel as second-tier subcontractors to provide key components of the KEEP shelters, including the structurally insulated panels, for shipment to Kuwait, where the shelters would be assembled by TaSM.

34.    Under the Subcontract, JCBAS was to provide a kit of supplies for TaSM to assemble the shelters in Kuwait. The kit was to contain all parts necessary to construct the buildings, including all building panels and components. All parts for each building were to be shipped together as one shipment in two containers.

35.    JCBAS also committed to provide training for the TaSM installation team for erecting the kits in Kuwait, and JCBAS included the cost of this training in its price to TaSM for the proposal.

36.    The Subcontract was issued as a firm fixed price, indefinite-delivery/indefinite quantity contract, whereby TaSM would issue to JCBAS delivery orders under the Subcontract for specific work. The ceiling value of the Subcontract was $12,528,000.

37.    Paragraph 18 of the Subcontract contains a Warranty provision that states:

> Subcontractor represents and warrants (1) that the price charged for the goods and /or services purchased pursuant hereto shall be no higher than Subcontractor's current price to any other customer for the same quality and quantity of such goods or services; (2) that all goods and services delivered pursuant hereto will be new, unless otherwise specified, and free from defects in material and workmanship; (3) that all goods and services will conform to applicable specification, drawings, and standards of quality and performance, and that all items will be free from defects in

7

design and suitable for their intended purpose; (4) that the goods covered by this order are fit for consumer use, if so intended; (5) that all warranties made by seller, collectively and individually, shall not be voided under any circumstances and should the goods delivered become damaged for any reason that Subcontractor shall pay all costs for repair of the goods regardless of how the damage occurred . . . .

The Warranty provision then states that the "Subcontractor shall perform all warranty service" and "the goods delivered shall be covered by the Subcontractors warranty" for specific periods of time depending on the specific goods, before concluding with the following emphasized provision:

SELLER HEREBY EXPRESSLY WARRANTS THAT ALL GOODS DELIVERED TO BUYER UNDER THIS AGREEMENT OR UNDER ANY ORDER SHALL BE FREE FROM ALL DEFECTS. SELLER EXPRESSLY WARRANTS THAT ALL GOODS DELIVERED HAVE BEEN DESIGNED AND SHALL BE ABLE TO WITHSTAND AT LEAST FOR THE MINIMUM DURATION OF THE TIME STATED ABOVE FOR EACH PART ANYWHERE IN THE WORLD. SELLER AGREES THAT ANY ITEM THAT IS DAMAGED AT ANY TIME, INCLUDING, BUT NOT LIMITED TO DURING THE SETUP, TAKEDOWN, OR RESET OF ANY BUILDING, SYSTEM OR COMPONENT THEREOF FOR THE DURATION SPECIFIED ABOVE FROM THE ACCEPTANCE OF THE GOOD BY THE BUYER AND THE U.S. GOVERNMENT, SHALL BE REPLACED AT THE SOLE EXPENSE OF SELLER WITHOUT ANY RIGHT OF REPAYMENT, SETOFF OR COVER FROM BUYER. SELLER AGREES TO INDEMNIFY BUYER AGAINST ANY AND ALL WARRANTY OR PRODUCT CLAIMS, EXCEPT TO THE EXTENT THAT ANY CLAIM IS DUE SOLELY TO THE FAULT OF BUYER. SELLER AGREES TO INDEMNIFY BUYER AGAINST ALL WARRANTY CLAIMS MADE BY THE GOVERNMENT. IF BUYER IS REQUIRED BY THE GOVERNMENT TO EXPEND ANY FUNDS OR PERFORM ANY WORK TO REPAIR OR REPLACE ANY ITEM WARRANTED BY SELLER, SELLER AGREES TO REPAY BUYER FOR ALL SUCH WORK AND THE COSTS ASSOCIATED THEREWITH.

38.    The Subcontract's Warranty provision also provides a chart listing the source of replacement parts for the various components of the KEEP shelters. "Johnson Controls" is listed as the source of all replacement parts listed on the chart.

8

39.     The Subcontract also gives TaSM the right to terminate JCBAS for default or breach after giving JCBAS notice of the default or breach and seven days to cure:

> In addition, Buyer shall be entitled to terminate this Subcontract for default or breach by Subcontractor if Subcontractor fails to remedy such conditions within seven (7) days from the date of receipt of notice from Buyer concerning the existence of the condition. If any termination of this Subcontract made in good faith for default or breach by Subcontractor is subsequently determined to have been without legal justification, the rights and obligations of the Parties shall be the same as if the Subcontract (or the Order in question) had been rightfully, and with legal justification, terminated for default or breach.

40.     TaSM and JCBAS executed Subcontract Delivery Order 0001 ("DO1"), effective March 28, 2014. DO1 was issued as a firm fixed price delivery order, for the procurement of seventy-two (72) two-story KEEP shelters at a price of $174,000 each, for a total DO1 price of $12,528,000. The period of performance of DO1 was from February 11, 2014, until December 31, 2014.  A true and correct copy of DO1 is attached hereto as **Exhibit B** and incorporated herein by reference.

41.     Attachment 1 to DO1 was a statement of work ("Delivery Order SOW"), which detailed the scope and requirements for JCBAS's performance on the project. The Delivery Order SOW requirements included, for example:

a) JCBAS was to provide "detailed information on the design for the shelters, including all the components that are part of the total shelter (stairs, platforms, self-leveling floor, etc), electrical components design, [Electronic Control Unit ('ECU')] and Fire Alarm System (FAS) design, and all other requirements to ensure the overall shelter design is completely addressed."

b) JCBAS was required to "cover all the required tools during the design review that will be necessary to erect the shelters, and the design of how the shelters will be packaged into containers."

9

c) JCBAS was required complete the packing of the shelters "in the most effective way to be ready for shipping but no greater that [sic] two containers per two story shelter."

d) JCBAS was to "fully package all 72 two-story shelters including tools that will be required to assemble the shelters into two 40' containers" provided by TaSM. The fully packaged containers would be made ready for shipment from Dublin, VA and picked up by TaSM.

e) JCBAS was required to include in the shelters "all the items required for the complete installation (electrical, ECU, etc.) as listed in the proposal."

f) JCBAS was "responsible for the provision of all components of the shelters, including every part necessary for final and complete assembly. All components, including the shelter as a whole, shall be in conformance with the [Performance Work Statement ('PWS')] and the Proposal Documents."

g) JCBAS was to provide "a fire alarm and notification system using Mircom components in conformance with the PWS."

h) JCBAS was required to "produce and assemble three units for [Army Test and Evaluation Command ('ATEC')] certification. All three units shall pass all test objectives. All three units shall be undamaged, complete and ready for operation before testing. This certification is to be completed at Dublin, Virginia."

i) JCBAS was required to provide a draft of the Shelter Guide and all Material Safety Data Sheets one month prior to the ATEC inspection.

j) JCBAS was required to "include in the shipping container for each individual shelter a shelter guide."

k) JCBAS was required to ensure that all "components of the shelter, to include all hardware and accessories required for full operation of the shelters shall be packaged in their final form, ready for final assembly."

l) JCBAS was required to "provide training support to [TaSM] on all components of the ATEC certified shelters, to include construction, installation, repair, and troubleshooting. Training support provided shall ensure that [TaSM] is able to fully assemble the shelters and that they operate as required. Training shall be provided to TaSM personnel at Dublin, VA and once at Camp Buehring, Kuwait."

m) JCBAS was required to "provide monthly status reports by the 2nd of each month for the previous month" that "address at a minimum the current state of the implementation, implementation schedule updates, reasons for delays if any, and the recommended solution for schedule improvements."

n) JCBAS was required to provide a Shelter Guide, Shelter Specifications, and Electrical Component Documentation as required by Delivery Order 0001. JCBAS was also required to provide the Original Equipment Manufacturer Manuals for all associated equipment as part of the packaging.

o) JCBAS was required to provide the electrical system and FAS system, both of which were required to comply with the specific building codes listed in PWS.[1]

**JCBAS's Initial Performance Failures and the First Cure Notice**

42.     JCBAS failed to meet even the most basic requirements of the Subcontract from the outset of its involvement with the KEEP project.

---

[1] The Army designated the PWS "For Official Use Only," and, therefore, a copy is not attached to this Complaint. However, the Army made earlier versions of the PWS available to the public as part of the RFP. *See* https://www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=b9d9ede5681bfc0d2d8392e0e1c70def. Although the Army made some modifications when it issued the PWS as an attachment to the Prime Contract, the key requirements alleged herein appear in all versions.

11

43.     JCBAS at times expressed frustration with its role as a subcontractor, and instead acted as if it was the prime contractor and in control of the project, disregarding its clearly defined role as set forth in the Subcontract.

44.     Various JCI and JCFS representatives also injected themselves into the relationship between TaSM and JCBAS.  For example, JCI and JCFS personnel attended meetings with TaSM to discuss the Subcontract and performance thereunder, JCI and JCFS personnel performed site visits both in Dublin, VA and in Kuwait, and JCI and JCFS personnel regularly communicated with TaSM regarding the requirements of the Subcontract and JCBAS's performance.

45.     Immediately after executing the Subcontract, JCBAS began missing deadlines. All 72 two-story KEEP shelters under DO1 were scheduled to be completed by December of 2014, but JCBAS caused this schedule to slip substantially.

46.     As part of its performance under the Subcontract, JCBAS was required to provide certain information, technical and otherwise, regarding the KEEP shelters being provided to the Army. Despite repeated requests from TaSM, JCBAS continually failed to meet this requirement.

47.     Also as part of its performance under the Subcontract, JCBAS was required to attend scheduled meetings with TaSM and Army personnel. JCBAS regularly missed these required meetings, with little to no explanation or notification to TaSM.

48.     The Army expressed concern that JCBAS was slow in providing information in connection with the KEEP project.

49.     On April 30, 2014, TaSM issued a cure notice to JCBAS ("First Cure Notice"), giving JCBAS seven (7) days to remedy the breaches of the Subcontract relating to its failure to

provide required information and attend required meetings. A true and correct copy of the First Cure Notice is attached hereto as **Exhibit C** and incorporated herein by reference.

50.    On May 5, 2014, the Defendants responded to the First Cure Notice, denying the problem while adding resources to correct the problem. A true and correct copy of the Defendants' response to the First Cure Notice is attached hereto as **Exhibit D** and incorporated herein by reference.

51.    TaSM rejected the response to the First Cure Notice as inadequate, but extended the cure period for an additional four days to accommodate a conversation between the leaders of the companies.

52.    TaSM's President, William Jonas, spoke with JCBAS's General Manager, David Westrick, to address the issues, and JCBAS committed to take several actions to correct the issues addressed in the First Cure Notice, including removing Joseph Marsilii as JCBAS's Project Manager for the Subcontract. Mr. Marsilii was a major cause for the lack of information and timely responses, and his involvement created a hostile relationship between JCBAS and TaSM.

53.    Because of these commitments, including the commitment to remove Mr. Marsilii from the project, TaSM accepted the Defendants' plan and canceled the First Cure Notice on May 19, 2014.

54.    However, the Defendants failed to live up to these commitments, still failing to provide timely information and failing to remove Mr. Marsilii from the project.

### JCBAS's Ongoing Performance Failures

55.    After TaSM canceled the First Cure Notice, JCBAS's performance failures continued and, in fact, grew.

*ATEC Inspection*

56.     One of the first deliverables that JCBAS needed to provide was the three completed KEEP shelters for the ATEC inspection. During a design review meeting with TaSM on March 28, 2014, the Defendants indicated that, due to supplier delays, they would be unable to meet the original May 22, 2014 ATEC inspection date as stated in the project schedule.

57.     TaSM gave JCBAS the opportunity to identify a date by which it would be ready for the critical ATEC inspection. The Defendants requested the ATEC inspection be postponed until June 2, 2014.

58.     After TaSM requested that the Army postpone the ATEC inspection date at the request of the Defendants, the Army agreed to move the ATEC inspection date to June 3, 2014.

59.     On May 6, 2014 (the day after the Defendants provided the initial inadequate response to the First Cure Notice), The Defendants sent a letter to TaSM, stating "Johnson Controls Inc. confirms that we will have a building ready for inspection on June 3rd, 2014. Furthermore, we would like to requests [sic] that the ATEC inspection be scheduled for that date. . . . It will be available for inspection anytime after 8:00 a.m."

60.     On May 21, 2014, however, the Defendants informed TaSM that they were having further problems with the supplier of the exterior skins for the KEEP shelters. Although the Defendants promised that, if everything went according to plan, "we have enough days in our production schedule to be ready for ATEC inspection," they requested that the inspection be delayed by one week to allow for any unforeseen circumstances and troubleshooting.

61.     ATEC requires 30 days' notice to reschedule an inspection, and any request to delay the inspection would exacerbate the schedule issues the Defendants already caused. Due to the difficulty in rescheduling the ATEC inspection, the impact another delay might have on

the overall schedule, and the Defendants' promise that they would be ready for the inspection, TaSM instructed JCBAS to proceed according to the June 3, 2014 ATEC inspection date.

62.     On May 28, 2014, representatives from the Defendants and TaSM participated in a conference call, and JCBAS's Charles Carter assured TaSM that everything was on schedule for the June 3, 2014 ATEC inspection.

63.     On June 2, 2014, notwithstanding Mr. Carter's assurances and earlier commitments by the Defendants, TaSM and the Army discovered that not a single building was fully assembled and ready for the ATEC inspection. The entire back half of the main building for inspection was not complete, the HVAC unit was not installed, and many trim and other finish pieces were missing. It became clear that JCBAS had stopped working on the test units several days prior to the ATEC inspection date rather than continue to work to the deadline to attempt to complete as much of the buildings as possible before the inspection.

64.     Despite the test units not being 100% completed, the ATEC inspection went forward as scheduled. The inspection revealed numerous deficiencies in JCBAS's design and construction of the KEEP shelters.

65.     On June 16, 2014, ATEC provided an extensive discrepancy list and guidance based on its inspection.   TaSM forwarded the discrepancy list to JCBAS the same day, requesting that JCBAS "make corrections ASAP and provide pictorial proof that the corrections have been made ASAP." A true and correct copy of TaSM's June 16, 2014 email to JCBAS and the attached June 16, 2014 ATEC discrepancy list are attached hereto as **Exhibit E** and incorporated herein by reference.

66.     JCBAS's deficiencies were quite serious. By way of example only, the top emergency egress platform had two large gaps with no railing that presented a fall hazard for

soldiers occupying the buildings. Similarly, a document holder inside the building had sharp edges that created further risk of harm to the troops. JCBAS further failed to label significant electrical hazards with a "HIGH VOLTAGE" marking. The buildings were also constructed in such a way that presented numerous trip hazards based on uneven flooring and small (one inch) steps. The inspection report identified many other deficiencies and deviations from the PWS.

67.     The Army told TaSM to "direct JCI to make corrections and provide pictorial proof that the corrections have been made ASAP." The Army emphasized that "ATEC will NOT provide a Shelter Release for occupancy until the proof of corrections have been provided." TaSM provided the ATEC discrepancy list and guidance, along with the Army's comments, to JCBAS. TaSM also provided JCBAS with a detailed action plan to resolve the issues identified in the JCBAS inspection.

68.     Despite these problems, ATEC conditionally approved the buildings pending resolution of the specific deficiencies it identified. JCBAS was required to resolve those issues and comply with the shipping and delivery schedule outlined in the Subcontract. However, JCBAS never sufficiently resolved the deficiencies identified by the ATEC inspectors.

69.     On October 1, 2014, TaSM received a conditional safety release and formal ATEC report. Because of JCBAS's failure to comply with the Subcontract requirements, ATEC's final report found that the buildings were unsuitable for assembly and disassembly by soldiers, and soldiers were not allowed to perform work on the shelters (both of which were express requirements of the Prime Contract and Subcontract).

70.     On October 6, 2014, TaSM informed JCBAS via letter that, based on the formal ATEC report, JCBAS did not meet the requirements of the Subcontract with respect to the ATEC inspection ("ATEC Deficiency Letter"). The ATEC Deficiency Letter detailed the deficiencies

16

noted by the ATEC inspectors in the JCBAS test units. A true and correct copy of the ATEC deficiency letter is attached hereto as **Exhibit F** and incorporated herein by reference.

*Failure to Comply with Delivery Schedule*

71.     TaSM and JCBAS agreed upon a detailed delivery schedule outlining the dates by which JCBAS was required to complete certain obligations under the Subcontract, including the deadline for JCBAS to deliver kits of KEEP shelters to Camp Buehring, Kuwait.

72.     The Defendants knew that JCBAS's compliance with the delivery schedule was critical to TaSM's ability to meet its obligations to the Army under the Prime Contract.

73.     JCBAS repeatedly missed key deadlines, including deadlines for completing shelters for ATEC inspection as discussed above, providing various manuals for assembling and maintaining the KEEP shelters, and loading shipping containers with completed kits for shipment to Camp Buehring, Kuwait.

*Foam Insulation Issue*

74.     The KEEP shelters are made up of interior and exterior panels. During the proposal process for KEEP, JCBAS committed to construct *all* panels with a 22-gauge steel stud and non-bridging ribs bonded to high density BASF Neopor Expanded Polystyrene (EPS) sandwiched between a PVC-cladded, 24-gauge, 50-kilopound per square inch, G90 steel outer layer. This combination of products was promised to give the walls, roof and floors an insulation value of R-25.

75.     When the Army accepted TaSM's proposal, it incorporated JCBAS's description of the panel requirements into the Prime Contract, and TaSM incorporated the same requirements into its Subcontract with JCBAS.

76.     BASF touts Neopor's superior insulating abilities and has conducted studies showing that Neopor provides up to 20% higher insulation effect than conventional EPS panels.

77.     Notwithstanding the terms of the Subcontract and the superiority of the Neopor product, within weeks after signing the Subcontract, the Defendants sought to change the material to be used to insulate the walls.

78.     On or about March 4, 2014, the Defendants proposed to TaSM a switch to an alternate and inferior foam insulation, Styropor, for use in all of the panels. The Defendants' proposal for the switch stated that the Army would achieve cost savings and have better product availability with a switch to Styropor.

79.     TaSM brought the Defendants' proposal to the Army for approval. The Army expressed concern that there was a difference in quality between Neopor and Styropor. Although TaSM allowed the Defendants to submit studies and test results for consideration, the Army eventually concluded that Neopor was a superior product to Styropor. TaSM agreed with the Army, and withdrew the proposal to switch to Styropor. The Defendants were instructed to continue using Neopor in the KEEP shelters.

80.     The Defendants misrepresented that they would comply with this instruction. However, in reality, the Defendants proceeded with their original plan of substituting panels insulated with Styropor in an attempt to deceive TaSM and the Army that the panels were, in fact, insulated with Neopor, as promised.

81.     Notwithstanding the Defendants' deceit, TaSM discovered a variation in the coloring of the core materials in the panels when it inspected them in Kuwait in July of 2014. Upon further investigation, TaSM learned that the white core materials were Styropor and the gray core materials were Neopor.

82.     The Army expressed concern to TaSM regarding the Defendants' substitution of materials that were not requested in the SOW.

83.     At the time of discovery, however, the Defendants already had shipped a large quantity of the panels containing the improperly substituted product, and TaSM and the Army had no choice but to accept the lower-grade materials or risk missing the deadlines of the project. Therefore, the Army was forced to accept the substitution of Styropor for internal panels that had already been shipped, on the condition that all exterior panels would be insulated with Neopor only. In exchange for accepting this unapproved and deceptive substitution, the Army required TaSM to provide additional training in Kuwait at TaSM's own expense.

84.     Notwithstanding its earlier promises of cost savings, the Defendants attempted to deceive TaSM into believing that there was almost zero difference in price between Neopor and Styropor. This representation was false, as nonconforming materials with the improperly substituted Styropor were approximately 30-50% cheaper than conforming materials made with Neopor, as required by the Subcontract. Nonetheless, JCBAS insisted on full payment for the materials as if they were, in fact, conforming products.

*Additional Deficiencies in JCBAS's Performance*

85.     Throughout performance of the Subcontract, there were numerous other deficiencies in JCBAS's performance that were raised by TaSM and never remedied by JCBAS. Many of these deficiencies caused delays to the project, and in some cases caused TaSM to expend its own time and resources to remedy the issues caused by the Defendants.

86.     The Subcontract required JCBAS to ship each two-story shelter completely within two shipping containers. JCBAS failed to follow this requirement, often shipping materials for more than one shelter in the same container, and spreading out the shipment of one shelter's

materials across more than two containers and multiple shipments. In fact, JCBAS's shipping practices were so non-compliant that, at one point, JCBAS shipped all parts of a group of shelters except for the building panels, which are the essential building blocks of the structure. Without the panels, no work could be started to erect those shelters.

87. Throughout JCBAS's performance, there were problems with JCBAS's packing and shipment of the materials for the KEEP shelters. JCBAS often shipped containers without a proper manifest listing the container's contents, causing unnecessary delays and increased costs in order for TaSM to determine what had been shipped.

88. There were significant problems with the manner in which JCBAS packed the containers with the materials for the KEEP shelters. The improper packing techniques used by JCBAS caused many items to be damaged upon arrival in Kuwait. In addition to the damaged items, the poor packing techniques by JCBAS caused the items to shift in the container such that instead of TaSM being able to unload each container pallet by pallet using a forklift, TaSM was forced to unload the poorly packed containers by hand. This caused unnecessary delays, increased costs, and a risk of harm to the TaSM team members who had to unpack the containers.

89. JCBAS's inability to properly pack the containers with the materials for the KEEP shelters was so acute, that TaSM was required to dispatch shipping experts to Dublin, Virginia so that the experts could diagnose the deficiencies in JCBAS's packing process, and instruct JCBAS on proper techniques. This caused unnecessary delays and increased costs.

90. Many of the materials provided by JCBAS for the construction of the KEEP shelters were deficient and/or non-compliant with the requirements of the Subcontract and Prime Contract, including:

a)  The floor panels for the KEEP shelters were oxidized and stained before JCBAS loaded them into shipping containers. The Defendants knew of the problem, but JCBAS shipped the deficient floor panels anyway, packing them without proper protection and thereby causing the problem to exacerbate.

b)  The trusses for the KEEP shelters were too long which caused unnecessary delays in the construction of the shelters and resulted in gaps between panels which reduced the energy efficiency of the shelters.

c)  The panels were built with shiplap joints that were supposed to overlap to prevent heat loss and heat gain, but JCBAS built them with such inaccurate tolerances that the panel joints had gaps so large they could be seen through once the structure was erected.

d)  Over the exterior doors of the shelters, no panel was provided, creating a six-square-foot gap.

e)  The trim pieces did not have proper adhesive material, resulting in trim pieces falling off after installation and becoming damaged.

f)  The roof system provided by JCBAS did not allow for proper water runoff, which resulted in leaks in the shelters.

g)  The fire alarm system (FAS) provided by JCBAS lacked the equipment and function to meet applicable building and safety codes and standards governing design and installation of systems at Camp Buehring, as required by, *inter alia*, the PWS as incorporated into the SOW.

h)  The electrical system in the shelters did not meet requirements. For example, the system included electrical wires that were the wrong size, electrical breakers that

were the wrong size, miswired electrical outlets, and reversed generator connectors. The electrical system also did not meet applicable building and safety codes and standards governing design and installation of systems at Camp Buerhing, as required by, *inter alia*, the PWS as incorporated into the SOW. For example, the electrical panels had incorrect breakers that did not meet code, and the electrical wiring was an incorrect color and did not meet code.

    i) Stair rails were not manufactured correctly and required significant repair by TaSM.

91. Despite the warranty provisions of the Subcontract, JCBAS refused to fix problems raised by TaSM and the Army. JCBAS was given the opportunity to fix, for example, the oxidized flooring as the Army made it clear that providing oxidized aluminum flooring was not compliant. The Defendants' response was that the Army should put furniture over the bad spots so that nobody would see it.

92. The Army again specifically complained that the oxidized flooring was not consistent with the PWS requirements and expressed concern that JCBAS refused to correct the issue.

93. JCBAS was also required, for example, to fix cabling that did not fit because JCBAS unilaterally changed the location of the doors in the design. Rather than providing correctly sized cables, JCBAS suggested that TaSM drill a hole into the structural beam to pass the wire through, which caused TaSM to expend further time and required another design modification.

94. Further, on several occasions, TaSM requested that JCBAS send a representative to fix problems with the materials sent by JCBAS. However, JCBAS refused to timely send any

subject matter expert or other representative that possessed the skills and qualifications to perform these fixes. The Defendants offered to send only a program manager in response to TaSM's requests, even though this program manager could not fix any problems with the materials. The Defendants were aware of the very tight schedule and the impact of JCBAS's failure to provide competent repair personnel and compliant warranty service, but still failed nonetheless.

95. TaSM's proposal in response to the RFP was based, in part, on JCBAS's representation that each KEEP shelter could be assembled in three (3) days by a small team of workers using only basic tools. The KEEP shelters were significantly more difficult to assemble than represented by JCBAS, requiring more personnel than expected and heavy machinery in order to complete.

96. The Subcontract required JCBAS to provide all necessary tools required to assemble each KEEP shelter with the shipment of each shelter's materials. JCBAS failed to do so, forcing TaSM to spend significant time and money procuring the necessary tools.

97. The Subcontract required JCBAS to provide proper training in Kuwait for the assembly of the KEEP shelters. However, the JCBAS trainers did not complete the full required number of training days, failed to actually demonstrate how to assemble a shelter, and left Kuwait before the training building was completely assembled. In particular, the trainers did not install the roof and when asked when they were coming back, they responded that they would return in a month, which was unacceptable based on the delivery schedule in both the Prime Contract and the Subcontract.

98. The Prime Contract and Subcontract both required that any publicity relating to the KEEP shelters must be approved by the U.S. Government contracting officer. However, the

Defendants used video footage of the erection of the KEEP shelters at an exhibition which had more than 25,000 visitors without the express permission required by the U.S. Government.

### The Second Cure Notice

99.    On July 16, 2014, TaSM sent JCBAS a Notice of Costs and Damages which described several issues in JCBAS's performance under the Subcontract, including JCBAS's refusal to ship according to the schedule outlined in the SOW, failure to provide the required tools for construction of the KEEP shelters, failure to provide detailed shipping documentation, failure to ship each KEEP shelter as a complete shipment, and failure to satisfactorily complete the test units for the ATEC inspection. A true and correct copy of the July 16, 2014 Notice of Costs and Damages is attached hereto as **Exhibit G** and incorporated herein by reference.

100.    On July 17, 2014, TaSM issued a second cure notice to JCBAS ("Second Cure Notice"). The Second Cure Notice listed a series of deficiencies with JCBAS's performance under the Subcontract, and again gave JCBAS seven (7) days to remedy the described breaches of the Subcontract. A true and correct copy of the Second Cure Notice is attached hereto as **Exhibit H** and incorporated herein by reference.

101.    Among the deficiencies listed in the Second Cure Notice, TaSM specifically pointed out that:

a)    JCBAS unilaterally and deceptively substituted Stryropor in the wall panels of several KEEP shelters, breaching the requirement that all panels were to be made with Neopor.

b)    JCBAS continually failed to meet the required shipping schedule, delaying multiple shipments and thereby causing significant delays to the project.

    c) JCBAS failed to provide required detailed shipping documents for several shipments, causing unnecessary delay in unloading the shipments.

    d) JCBAS failed to provide all tools required in the assembly of the shelters, in breach of the requirement in the SOW.

    e) JCBAS did not complete the test units in time for the ATEC inspection, nor did it fix the issues with the test units that were pointed out after the ATEC inspection.

102.    On or about July 24, 2014, the Defendants sent their OCONUS Regional Manager, Kevin Flaharty, to TaSM to attempt to have TaSM remove the Second Cure Notice. During the meeting, Mr. Flaharty agreed to several fixes that would address the issues in the Second Cure Notice, as well as payment of money for damages that JCBAS's failures and delays had caused to TaSM.

103.    On July 25, 2014, TaSM sent a proposed agreement based on the issues and resolutions discussed at the July 24, 2014 meeting, offering to cancel the Second Cure Notice if the proposed agreement was signed by JCBAS. Mr. Flaharty responded that he would have legal counsel review the agreement and respond by July 29, 2014. JCBAS neither signed nor expressly rejected the written memorialization of the agreements reached during the July 24, 2014 meeting.

104.    On July 29, 2014, the Defendants responded to the Second Cure Notice by letter ("Second Cure Response"). The Second Cure Response essentially denied the issues raised in the Second Cure Notice, offering no solutions to cure the issues raised by TaSM. A true and correct copy of the Second Cure Response is attached hereto as **Exhibit I** and incorporated herein by reference.

105. The Second Cure Response acknowledged that there were delays affecting the shipping schedule, and stated that the Defendants had "ideas on how the parties can continue to improve the shipping schedule."

106. On August 1, 2014, TaSM responded by letter to the Second Cure Response ("TaSM Cure Rebuttal"), in which TaSM rebutted the assertions made in the Second Cure Response. The TaSM Cure Rebuttal also provided a "final opportunity for JCBAS to address the issues, present a plan for remedying the problems, and comply with the agreements made not only in the Subcontract, but also in the agreements made since." A true and correct copy of the TaSM Cure Rebuttal is attached hereto as **Exhibit J** and incorporated herein by reference.

107. On August 8, 2014, the Defendants responded by letter to the TaSM Cure Rebuttal ("Reply Cure Letter"), in which the Defendants again denied responsibility for the issues originally raised in the Second Cure Notice. A true and correct copy of the Reply Cure Letter is attached hereto as **Exhibit K** and incorporated herein by reference.

108. In the Reply Cure Letter, the Defendants mischaracterized the Army's position on the foam insulation issue, and used that mischaracterization to shift responsibility for shipping delays to TaSM.

109. In the Reply Cure Letter, the Defendants also stated that they were willing to accept the placement of a TaSM employee at the Dublin, Virginia site to serve as a Quality Assurance supervisor. However, when TaSM sent a Quality Assurance supervisor to the site, the Defendants would not allow him access to the manufacturing facility where he could actually perform quality assurance work. Instead, he was allowed access only to the portion of the facility in which containers were packed.

110.     Ultimately, JCBAS did not fully address the remaining issues raised in the Second Cure Notice, nor did it present a plan for remedying the problems.

111.     On September 5, 2014, TaSM sent via letter a Notice of Ongoing Issues and Request for Response ("Notice of Ongoing Issues"), which reiterated some of the issues raised in previous letters to JCBAS and the Second Cure Notice. TaSM requested a written response from JCBAS as to how the unresolved issues would be addressed. The Notice of Ongoing Issues established a deadline of September 12, 2014 for JCBAS to provide a written response. A true and correct copy of the Notice of Ongoing Issues is attached hereto as **Exhibit L** and incorporated herein by reference.

112.     JCBAS provided no written response to the Notice of Ongoing Issues.

113.     Because JCBAS never cured the defaults and breaches identified in the Second Cure Notice, TaSM never lifted the Second Cure Notice.

### The Stop Work Order

114.     On September 10, 2014, TaSM issued JCBAS an order to stop all work on the Subcontract ("Stop Work Order") stemming from a host of unresolved performance issues. The Stop Work Order identified twenty separate issues that were deficient in JCBAS's performance under the Subcontract. TaSM requested that JCBAS address each of the twenty issues of noncompliance listed in the Stop Work Order and provide adequate assurances that JCBAS would address the issue and meet the Subcontract requirements. A true and correct copy of the Stop Work Order is attached hereto as **Exhibit M** and incorporated herein by reference.

115.     Instead of responding to the issues raised in the Stop Work Order, by letter on September 16, 2014, the Defendants rejected the Stop Work Order as invalid, arguing that TaSM did not have authority under the Subcontract to issue such an order. A true and correct copy of

the Defendants' September 16, 2014 letter is attached hereto as **Exhibit N** and incorporated herein by reference.

116. Thereafter, JCBAS compounded its breaches and defaults by directing communications regarding the Subcontract and JCBAS's performance thereunder directly to the Army and failing to notify TaSM of such communications.

117. On September 24, 2014, TaSM sent JCBAS two additional letters. The first September 24, 2014 letter notified JCBAS that it was in breach of the Subcontract's limitations on communications with the Army. That letter also notified JCBAS that TaSM was aware that JCBAS wrongfully distributed TaSM's proprietary materials to third parties in violation of the Subcontract. A true and correct copy of TaSM's first September 24, 2014 letter is attached hereto as **Exhibit O** and incorporated by reference.

118. TaSM's second September 24, 2014 letter notified JCBAS that TaSM would not lift the stop work order unless and until JCBAS provided adequate written assurances of future performance. TaSM notified JCBAS that, if it did not receive such assurances by September 30, 2014, TaSM would terminate the Subcontract for default. A true and correct copy of TaSM's second September 24, 2014 letter is attached hereto as **Exhibit P** and incorporated herein by reference.

119. On September 24, 2014, the Defendants submitted a written response to the Stop Work Order which addressed each of the twenty issues in an argumentative and defensive manner. The September 24, 2014 letter failed to provide any assurance that JCBAS would perform in compliance with the terms of the Subcontract in the future. A true and correct copy of the Defendants' September 24, 2014 letter is attached hereto as **Exhibit Q** and incorporated herein by reference.

28

120. On September 30, 2014, the Defendants sent another letter to TaSM simply resubmitting its September 24, 2014 letter and asserting that letter provided "assurances for resolution of issues presented" in the Stop Work Order. A true and correct copy of the Defendants' September 30, 2014 letter is attached hereto as **Exhibit R** and incorporated herein by reference.

121. On October 7, 2014, TaSM informed JCBAS via letter that the Stop Work Order remained in place because the September 30, 2014 letter failed to give assurances as to how the issues would be resolved. A true and correct copy of TaSM's October 7, 2014 letter is attached hereto as **Exhibit S** and incorporated herein by reference.

122. JCBAS continued to attempt to perform under the Subcontract despite the existence of the Stop Work Order. TaSM reiterated to JCBAS by email on October 8, 2014 that the Stop Work Order remained in place, warning JCBAS that any work performed under the Subcontract from the date the Stop Work Order was issued would be at JCBAS's own risk.

123. In the meantime, JCBAS's intransigent refusal to admit to any of its myriad performance failures was impacting the Army and further delaying the delivery schedule that JCBAS already had compromised. To mitigate the harm to the government, on October 15, 2014, TaSM sent JCBAS a letter lifting the Stop Work Order on a provisional basis under two conditions: (1) JCBAS was required to correct, fix, or replace all problems under the Subcontract to the satisfaction of both TaSM and the Army within forty-five (45) days; and (2) JCBAS was required to ensure a representative of its subcontractor Premium Steel would be onsite in Kuwait at all times until the KEEP units were fully completed and accepted by the Army. A true and correct copy of TaSM's October 15, 2014 letter is attached hereto as **Exhibit T** and incorporated herein by reference.

124.    On October 16, 2014, the Defendants responded to the provisional lifting of the Stop Work Order, again arguing that TaSM did not have authority to issue the Stop Work Order in the first place. Nonetheless, the Defendants affirmed that they would correct, fix, or replace all problems under the Subcontract to the satisfaction of both TaSM and the Army within forty-five days. The Defendants further conceded that this demand was "in line with our contractual obligations." However, the Defendants refused to provide a representative of its subcontractor Premium Steel on site in Kuwait at all times, instead committing only to send a Premium Steel representative for a limited period of time to correct, fix, or replace the problems identified previously by TaSM. A true and correct copy of the Defendants' October 16, 2014 letter is attached hereto as **Exhibit U** and incorporated herein by reference.

125.    On October 17, 2014, TaSM lifted the Stop Work Order and provided JCBAS with instructions for complying with its obligations under the Subcontract. A true and correct copy of TaSM's October 17, 2014 letter is attached hereto as **Exhibit V** and incorporated herein by reference.

126.    On October 20, 2014, the Defendants accepted in writing the terms and instructions set forth in TaSM's October 17, 2014 letter lifting the Stop Work Order. A true and correct copy of the Defendants' October 20, 2014 letter is attached hereto as **Exhibit W** and incorporated herein by reference.

### JCBAS's Failure to Cure its Defaults and TaSM's Termination of the Subcontract

127.    On October 27, 2014, TaSM sent JCBAS a Notification and Guarantee Requirement letter ("Requirement Letter"). The Requirement Letter informed JCBAS that TaSM would be paying several of JCBAS's invoices, but TaSM was unable to pay other invoices because JCBAS shipped several partial buildings despite the Subcontract requirements and

30

TaSM's repeated direction not to do so. The Requirement Letter stated that due to the delays caused by JCBAS, and the additional costs incurred by TaSM as a result, TaSM required JCBAS to guarantee that all remaining units and replacement materials would be shipped by November 21, 2014, to meet the schedule imposed by the Subcontract. The Requirement Letter also offered that TaSM would provide additional labor should JCBAS require it to meet the shipping schedule. A true and correct copy of the Requirement Letter is attached hereto as **Exhibit X** and incorporated herein by reference.

128.    The Defendants responded by email on October 27, 2014 that they "will have all remaining 52 containers for DO1 ready for shipment by 11/21 assuming you can deliver empty containers by the end of this week and begin pickups on 11/4." A true and correct copy of the Defendants' October 27, 2014 email is attached hereto as **Exhibit Y** and incorporated herein by reference.

129.    As requested, TaSM delivered empty containers to JCBAS by October 31, 2014, and TaSM began picking up containers from JCBAS on November 4, 2014.

130.    The November 21, 2014 shipping deadline was critically important in view of the Thanksgiving holiday on November 27, 2014 and the New Year holiday. Because the materials were transported from the United States to Kuwait by sea, all items needed to ship by November 21 to arrive in the port of Kuwait in time to clear customs before Kuwait shut down its facilities for an extended period of time for the New Year holiday. Any delay beyond November 21 would cause the project to be delayed by two weeks at the very least.

131.    JCBAS again disregarded its obligations under the Subcontract and the shipping schedule to which it agreed in connection with TaSM's agreement to lift the Stop Work Order. JCBAS missed its shipping deadline and the containers sat at the dock for over a week due to the

Thanksgiving holiday, putting them on schedule to sit in the port in Kuwait during the New Year shut down, and causing the entire project to come to a halt. After numerous earlier delays and breaches of the Subcontract, JCBAS was aware that it was already at risk of termination. Its failure to meet the November 21, 2014 shipping date further confirmed the conclusion that JCBAS was not committed to its Subcontract obligations and had no plans to change its earlier course of conduct.

132. TaSM nevertheless was forced to ship JCBAS's late shipment to Kuwait due to JCABS's failure to comply with the specific requirement in the Delivery Order SOW that all components for each discrete shelter must ship together in no more than two shipping containers. In breach of the Delivery Order SOW, many components necessary to complete the first set of 36 structures were missing from the earlier shipments and instead included with the November 2014 shipment without an itemized inventory list. TaSM needed those missing components to complete the first set of 36 structures. Had JCBAS complied with the contractual requirement to ship each building in two containers at one time, all components for the first set of 36 shelters would already have been in Kuwait, and TaSM would not have had to pay to ship and store the nonconforming goods that JCBAS shipped after the November 21, 2014 deadline.

133. On December 3, 2014, TaSM terminated, effective immediately, the Subcontract by letter to JCBAS ("Termination Letter"). The Termination Letter cited multiple breaches of the Subcontract as the basis for termination, as noted by TaSM in numerous written communications with JCBAS throughout performance of the Subcontract. A true and correct copy of the Termination Letter is attached hereto as **Exhibit Z** and incorporated herein by reference.

134.    The Termination Letter notified JCBAS that all nonconforming and/or untimely materials currently in Kuwait or in transit would be returned to JCBAS's offices at JCBAS's expense.

135.    Since terminating JCBAS for default, TaSM has continued to learn of additional breaches of the Subcontract and breaches of warranty by JCBAS, including rust on the buildings, electrical panels that are not up to code, incorrect electrical wiring, incorrect electrical breakers, damaged electrical receptacles, exposed live electrical wires, incorrect HVAC wiring, further unauthorized contact with the Army, leaks in the buildings, deteriorating adhesives, and damaged floor panels. TaSM also has learned that, despite being assured that JCBAS's shipment would contain all parts necessary to complete the project, several items were missing and were never supplied by JCBAS.

136.    Throughout the duration of the Subcontract, TaSM expended significant time and resources in attempting to get JCBAS to cure its performance, but to not avail. In addition to significant correspondence with JCBAS contractual representatives and senior management, TaSM even wrote several letters to JCI's General Counsel, Jerome Okarma, and its Chairman, President and Chief Executive Officer, Alex Molinaroli, to bring attention to the matter in hopes of getting JCBAS's performance failures resolved. However, these letters were largely ignored, with the only response consisting of a denial and instruction not to contact Mr. Molinaroli.

### *Storage of Non-Conforming/Untimely Goods*

137.    After termination of the Subcontract, TaSM repeatedly contacted JCBAS regarding the goods located in Kuwait that did not conform to the requirements of the Subcontract, or were shipped after the deadline established by the Requirement Letter, requesting JCBAS provide a location for TaSM to ship these goods back to JCBAS.

138.     On January 21, 2015, TaSM responded to several letters from the Defendants' outside counsel regarding the Termination Letter and the JCBAS goods remaining in Kuwait. TaSM reiterated its rejection of JCBAS's late and non-conforming goods, and again requested a location where TaSM could return to JCBAS the late and non-conforming goods remaining in Kuwait.

139.     To date, JCBAS has not provided TaSM an address to which TaSM can return JCBAS's late and non-conforming goods. JCBAS's late and non-conforming goods have remained in storage in Kuwait, causing TaSM to incur additional costs for storage, demurrage, and related expenses.

### *Excessive Invoices and Overpayment*

140.     As TaSM made clear in its October 27, 2014 letter, JCBAS improperly submitted invoices requesting payments above and beyond the prices contemplated by the Subcontract, the Delivery Order SOW, and DO1.

141.     TaSM's October 27, 2014 letter stated that TaSM would pay $5,928,777.04 to JCBAS, but "this payment does not relinquish any liability on the part of Johnson, and this payment does not provide acceptance of the items delivered and services performed by Johnson." TaSM further wrote that "TaSM does not waive any of its rights by providing payment of these invoices or by any other action."

142.     On October 28, 2014, TaSM paid JCBAS $5,928,777.04 by check.

143.     Upon auditing JCBAS's invoices and TaSM's payments, TaSM discovered that its $5,928,777.04 check included an overpayment in the amount of $1,010,835.35 for rejected goods and for materials and services that JCBAS never provided.

*Reprocurement*

144.     As a result of JCBAS's default under the Subcontract and subsequent termination, TaSM needed to find an alternate vendor to provide the materials JCBAS was contracted to provide.

145.     The Defendants executed exclusive supply agreements with key subcontractors and suppliers, such as Premium Steel and ThermaSteel. Because of those exclusive agreements, TaSM was unable to contract directly with those suppliers to provide the materials needed for the KEEP shelters. As a result, TaSM was forced to locate additional vendors. Given the specialized nature of this project, it proved extraordinarily difficult to locate a substitute supplier to mitigate the damages caused by JCBAS's breaches.

146.     In its first attempt to mitigate, TaSM identified a potential new supplier called IQ, LLC, who, together with its affiliates Evia Operations and Evia Finance, agreed to supply TaSM's material needs for the KEEP project, but required advance payments totaling approximately $2.8 million so that they could obtain raw materials. Given TaSM's dire position caused by JCBAS's default and failure to cure, TaSM reluctantly agreed to pay the $2.8 million in advances to IQ, LLC, Evia Operations, and Evia Finance in anticipation of prompt material supply to complete the KEEP shelters. Unfortunately, IQ, LLC failed to deliver the materials as promised. IQ, LLC, Evia Operations, and Evia Finance have not refunded TaSM's advance payments despite repeated demands to do so.

147.     After JCBAS defaulted on its Subcontract obligations and failed to cure, and then IQ, LLC and its affiliates failed to deliver materials despite receiving nearly $2.8 million in advance payments, TaSM was left with very limited options to fulfill its commitments to the

Army under the KEEP Prime Contract. In June 2015, TaSM decided that the best option was to establish its own manufacturing facility to supply the necessary materials for the KEEP shelters.

148.    Although TaSM has been able to satisfy its obligations under the first Delivery Order under the Prime Contract by using its own manufacturing facility, TASM incurred substantial costs to establish that facility and its overall manufacturing costs have been higher than those promised by JCBAS. TaSM also lost out on substantial additional work under the Prime Contract as a result of JCBAS's delays and breaches of the Subcontract.

### The Defendants' Interference with
### TaSM's Business Relationships and Expectancies

149.    Prior to the issuance of the RFP, JCBAS intended to compete for the KEEP work as a prime contractor. Once the RFP was issued as a small business set-aside, JCBAS was no longer eligible to compete as a prime contractor, and approached TaSM with the idea of being a KEEP subcontractor. JCBAS was not content with its role as a subcontractor under the Prime Contract.

150.    After TaSM was awarded the Prime Contract, the Defendants intentionally interfered with TaSM's business relationships and expectancies.

151.    The Defendants executed exclusive supply agreements with key subcontractors and suppliers, including Prime Steel and ThermaSteel, in violation of Section 31 of the Subcontract. JCBAS relied heavily on the knowledge, expertise, and capabilities of its subcontractors and suppliers in drafting its technical proposal in response to the RFP, and The Defendants knew that TaSM would have extreme difficulty in performing its obligations to the Army without full access to those subcontractors and suppliers.

152.    The exclusive agreements between or among the Defendants, Premium Steel, and/or ThermaSteel made it impossible for TaSM to obtain the materials needed for the assembly

36

of the KEEP shelters directly from Premium Steel and ThermaSteel, the only domestic manufacturers of those materials. TaSM had to go through the Defemdamts to obtain the materials required in performance of the Prime Contract.

153. The Defendants continually undertook intentional actions to damage TaSM's performance and reputation with the Government, including purposefully delaying shipping and delivery of materials needed by TaSM to assemble the KEEP shelters required under the Prime Contract despite repeated assurances that they would comply with the delivery schedule.

154. The Defendants continually provided nonconforming goods while attempting to deceive TaSM and the Government to believe the goods were, in fact, in conformance with the requirements in the SOW. They then interfered with and attempted to frustrate TaSM's efforts to fix or replace the nonconforming goods, significantly hindering TaSM's ability to provide the KEEP shelters required by the Prime Contract.

155. Throughout their performance of the Subcontract, the Defendants intentionally caused numerous disruptions to TaSM's performance of the Prime Contract, including, but not limited to, causing significant delays to the project, being non-responsive with respect to required deliverables, and communicating directly with Army personnel despite the express prohibition in the Subcontract against doing so.

156. In their direct and unsanctioned communications with the Army, the Defendants falsely claimed that the nonconformance issues and delays caused by their own conduct were actually TaSM's fault.

157. Prior to the termination of the Subcontract, JCI and JCFS personnel were visibly involved in discussions, disputes, and performance relating to the Subcontract. These JCI and

JCFS personnel contributed significantly to the disruptions caused by JCBAS under the Subcontract and the Prime Contract.

158.    The Prime Contract was intended to procure up to 280 KEEP shelters at a ceiling value of $29,429,017. Because of the intentional conduct of the Defendants, TaSM's performance of the Prime Contract was severely delayed, and the Prime Contract expired with $11,024,713.17 in unused value under the ceiling.

159.    The Army had a continuing need for additional shelters that could have been ordered under the Prime Contract.

160.    The Defendants knew that TaSM had a business expectancy that it would obtain the full ceiling value of the Prime Contract.

161.    As a direct result of the Defendants' wrongful conduct alleged herein, the Army did not issue delivery orders for all KEEP shelters under the Prime Contract. Instead, the Defendants succeeded in their efforts to interfere with the Prime Contract, preventing TaSM from benefiting from the full value of the Prime Contract and receiving 10% profit on the unused value under the ceiling.

162.    In addition, the Defendants knew that TaSM had a business expectancy that it would obtain additional government contracts to construct energy efficient shelters, including contracts for such structures for the U.S. Army in the United Arab Emirates and a Combined Aid Station at Camp Buehring.

163.    The Army provided a specific design for the Combined Aid Station at Camp Buerhing to TaSM. After evaluating the design, TaSM prepared a proposal to construct a 50-foot by 132-foot two-story energy-efficient structure, with a first aid station on the first level and living quarters for doctors and nurses on the second level.

164.    TaSM's proposal for the Combined Aid Station contemplated a total price of $2,446,100.62, 10% of which represented TaSM's profit.

165.    As a direct result of the Defendants' intentional delays and performance failures on the KEEP project, the Army decided not to fund the Combined Aid Station. Instead, the Defendants succeeded in their efforts to interfere with TaSM's legitimate business expectancy in the Combined Aid Station project, preventing TaSM from benefitting from the value of that project and receiving 10% profit.

166.    The energy-efficient buildings required in the United Arab Emirates are identical to the KEEP shelters, and TaSM had a reasonable business expectancy of receiving the contract, which is believed to be worth as much as $100 million.

167.    As a direct result of the Defendants' intentional delays and performance failures on the KEEP project, TaSM was not requested to provide these identical structures in the United Arab Emirates. Instead, the Defemdamts succeeded in their efforts to interfere with TaSM's legitimate business expectancy in the United Arab Emirates project, preventing TaSM from benefitting from the value of that project and receiving 10% profit.

<u>COUNT I - BREACH OF CONTRACT</u>
<u>(Against JCBAS Only)</u>

168.    Paragraphs 1-167 are incorporated by reference.

169.    The Subcontract is a valid and enforceable agreement between TaSM and JCBAS.

170.    JCBAS breached its duties to TaSM under the Subcontract as set forth in detail herein, including by sending non-conforming materials for the KEEP shelters, failing to timely provide required deliverables relating to the KEEP shelters, failing to meet required deadlines relating to the KEEP shelters, failing to provide required services relating to the KEEP shelters,

such as on-site training, failing to pack and ship the materials for the KEEP shelters according to the SOW, and failing to meet the required delivery schedule.

171. The numerous and continued breaches of the Subcontract by JCBAS caused significant issues in the shipping, delivery, and assembly of the KEEP shelters at Camp Buehring, Kuwait. These issues harmed TaSM and increased TaSM's costs of performing as set forth in detail herein, including by forcing TaSM to replace non-conforming goods, delay performance while the issues were addressed, increase the number of personnel required for assembly of the KEEP shelters, increase the amount of equipment needed for unloading and assembly of the KEEP shelters, and provide storage for JCBAS's non-conforming and untimely goods.

172. Each time there was a slip in schedule, the Army requested and TaSM was forced to give consideration for the slip at TaSM's own cost, even though delays were caused by JCBAS.

173. JCBAS's breaches of the Subcontract have caused TaSM to incur damages.

## COUNT II – BREACH OF WARRANTY
### (Against JCBAS Only)

174. Paragraphs 1-173 are incorporated by reference.

175. The Subcontract contains a valid and enforceable express warranty.

176. The goods provided by JCBAS were also subject to the implied warranties of merchantability and fitness for a particular purpose.

177. JCBAS breached its express and implied warranties to TaSM by providing materials that were poorly designed and manufactured, as described in detail herein.

178. JCBAS's breaches of its express and implied warranties caused significant problems in the assembly and operation of the KEEP shelters. TaSM was required to redesign,

reinstall, and rework, and replace many of the items delivered by JCBAS under the Subcontract, causing significant delays to the project and increased costs to TaSM.

179. JCBAS's breaches of its express and implied warranties have caused TaSM to incur damages.

## COUNT III – TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
### (Against JCBAS, JCI, and JCFS)

180. Paragraphs 1-179 are incorporated by reference.

181. A valid and binding contractual relationship existed in the Prime Contract between TaSM and the Army for construction of KEEP shelters.

182. The Defendants were aware of that contractual relationship.

183. TaSM had a contract expectancy of receiving additional contract awards providing shelters similar to the KEEP shelters, including contracts to provide such structures for the U.S. Army in the United Arab Emirates and at a Combined Aid Station at Camp Buerhing. TaSM had a reasonable probability of future economic benefit from additional contract awards.

184. The Defendants knew there was the potential for follow-on contract awards for energy efficient structures at Camp Buerhing, which TaSM had a reasonable expectancy of receiving based on its selection for the KEEP effort. The Defendants intentionally took steps to destroy TaSM's reputation and interfere with its reasonable expectation for this follow-on work.

185. As described in detail herein, the Defendants intentionally took actions to damage the contractual relationship and business expectancies between TaSM and the Army.

186. In taking these various actions, the Defendants were aware that their conduct would interfere with the contractual relationship between TaSM and the Army, their conduct would interfere with TaSM's valid business expectancy for additional energy efficient building

work, their conduct would harm TaSM's business, and damages to TaSM would occur as a result of their actions.

187.    The Defendants' conduct was unjustified and was specifically designed to interfere with the contractual relations and business expectancies between TaSM and the Army and to cause TaSM significant damage.

188.    The actions of the Defendants were intentional, willful, wanton and/or malicious, and were all taken for the Defendants' own benefit.

189.    As a direct and proximate result of the Defendants' actions, TaSM has been damaged through a disruption to its valid business expectancies on the Prime Contract and other contracts for construction of energy efficient shelters, including contracts to provide such structures for the U.S. Army in the United Arab Emirates and at a Combined Aid Station at Camp Buerhing.

190.    Specifically, as a direct and proximate result of the Defendants' actions, the Government did not issue to TaSM $11,024,703.17 in delivery orders under the Prime Contract, did not award TaSM a contract for $2,446,100.62 for the Combined Aid Station, and did not award TaSM a contract believed to be worth as much as $100 million for construction of energy efficient buildings in the United Arab Emirates.

191.    In addition to damages, TaSM has suffered irreparable harm to its reputation, goodwill, client relationships, and other assets, a value for which is incalculable.

## COUNT IV – TORTIOUS INTERFERENCE WITH A CONTRACT
### (Against JCI and JCFS Only)

192.    Paragraphs 1-191 are incorporated by reference.

193.    A valid and binding contractual relationship existed between TaSM and JCBAS.

194.    JCI and JCFS were aware of that contractual relationship.

42

195.     As described in detail herein, JCI and JCFS intentionally took actions to damage the contractual relationship between TaSM and JCBAS by inserting themselves into correspondence between TaSM, JCBAS, and the Army in an attempt to disrupt, delay, and frustrate performance of the Subcontract.

196.     In taking these various actions, JCI and JCFS were aware that their conduct would interfere with the contractual relationship between TaSM and JCBAS, their conduct would harm TaSM's business, and damages to TaSM would occur as a result of their actions.

197.     JCI and JCFS's conduct was unjustified and was specifically designed to interfere with the contractual relations between TaSM and JCBAS and to cause TaSM significant damage.

198.     JCI and JCFS were aware of TaSM's reasonable contract expectancy, and intentionally interfered with TaSM's Subcontract with JCBAS.

199.     As a direct and proximate result of JCI and JCFS's actions, TaSM has been damaged through a disruption to its valid contractual and business expectancies on the Subcontract.

200.     In addition to damages, TaSM has suffered irreparable harm to its reputation, goodwill, client relationships, and other assets, a value for which is incalculable.

## COUNT V – FRAUD
### (Against JCBAS, JCI, and JCFS)

201.     Paragraphs 1-200 are incorporated by reference.

202.     As described in detail herein, the Defendants made intentional false written and oral representations to TaSM in the form of JCBAS's proposal and other statements from personnel of the Defendants that JCBAS intended to provide materials needed for the KEEP shelters in accordance with the requirements of the Prime Contract and Subcontract.

43

203. Upon information and belief, at the time the Defendants represented to TaSM that they intended to provide materials for the KEEP shelters in accordance with the requirements of the Prime Contract and Subcontract, they did not, in fact, have such intent.

204. The Defendants intentionally substituted Styropor in the panels of the KEEP shelters, knowing that the Subcontract required the panels to be constructed with Neopor and knowing that the Army already had specifically considered but did not approve the substitution.

205. The Defendants intentionally concealed their substitution of Styropor in the panels of the KEEP shelters in an attempt to deceive TaSM and the Army into believing that JCBAS was, in fact, performing its obligations under the Subcontract.

206. TaSM reasonably relied upon the representations made by the Defendants.

207. TaSM had no knowledge of the Defendants' unauthorized use of Styropor in the panels until after the nonconforming goods arrived in Kuwait, and, as a result acted to its detriment in reliance on the Defendants' fraudulent misrepresentations.

208. As a direct and proximate result of its reliance on the Defendants' fraudulent misrepresentations, TaSM incurred damages because it was forced to provide the Army with additional goods and/or services at no additional cost to compensate the government for the non-conforming goods.

## RELIEF REQUESTED

WHEREFORE, by virtue of the foregoing, Plaintiff Technology and Supply Management, LLC demands that

1. The Defendants be held liable under each claim for relief set forth against them in this complaint;

2.      The Defendants be required to pay to TaSM all damages it has suffered by reason of their unlawful acts in an amount to be proven at trial, but presently calculated in excess of $15 million, together with legal interest from the date of accrual thereof;

3.      The Defendants be required to pay TaSM its reasonable attorneys' fees due to their fraudulent, wanton, and malicious conduct;

4.      The Defendants be held liable for punitive damages resulting from their fraudulent, willful, and tortious conduct in an amount to be established at trial and deemed proper by the Court;

5.      The Defendants be required to pay TaSM all costs of this action;

6.      The Defendants be preliminarily and permanently enjoined from further tortious interference with TaSM's business expectancies; and

7.      The Court award TaSM such other and further relief that it deems appropriate.


Dated: March 18, 2016                     Respectfully submitted,


                                          Todd R. Overman (VA Bar No. 48631)
                                          Brian R. Iverson
                                          (*pro hac vice* application to be filed)
                                          Bass, Berry & Sims PLC
                                          1201 Pennsylvania Ave NW, Suite 300
                                          Washington, DC 20004
                                          Phone: 202-827-2975
                                          Fax: 202-403-3819
                                          toverman@bassberry.com
                                          biverson@bassberry.com


                                          *and*


45

John S. Golwen
(*pro hac vice application to be filed*)
Bass, Berry & Sims PLC
The Tower at Peabody Place
100 Peabody Place, Suite 900
Memphis, TN 38103
Tel.: (901) 543-5900
Email: jgolwen@bassberry.com

*Counsel for Technology and
Supply Management, LLC*