IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| TECHNOLOGY AND SUPPLY MANAGEMENT, LLC, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil Action No. 1:16-cv-303 (AJT/MSN) ) |
| JOHNSON CONTROLS BUILDING AUTOMATION SYSTEMS, LLC, *et al.*, | ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

This government procurement, diversity case arises out of a subcontract between Plaintiff Technology and Supply Management, LLC ("TaSM") and Johnson Controls Building Automation Systems, LLC, ("JCBAS") to provide energy efficient relocatable shelters to the Army for use at Camp Buehring, Kuwait, all in connection with TaSM's prime contract with the Army (the "Subcontract"). TaSM terminated the Subcontract for default on December 3, 2014 and filed this action on March 18, 2016, seeking to recover damages for JCBAS' alleged breach of the Subcontract and related tortious conduct.[1]

Pending before the Court is a Motion for Partial Summary Judgment [Doc. No. 97] filed by Defendants JCBAS, and its affiliates Johnson Controls Federal Systems, Inc. ("JCFS") and Johnson Controls, Inc.'s ("JCI") (the "Motion"). Briefly summarized, defendants have moved for judgment as a matter of law on (1) TaSM's claim for "cover" damages, either for lack of standing or because TaSM was able to "cover" for an amount less than what it would have owed

---

[1] TaSM filed a five count Complaint alleging (1) breach of contract (against JCBAS), (2) breach of warranty (against JCBAS), (3) tortious interference with business expectancy, (4) tortious interference with contract (against JCFS and JCI), and (5) fraud.

under the Subcontract for the remaining shelters and any other claimed damages are consequential damages that are waived under the Subcontract; (2) TaSM's claim for shipping and storage costs associated with rejected shelters on the grounds that such expenses are incidental damages that are waived under the Subcontract; (3) TaSM's fraud claim on the grounds that any alleged misrepresentations related to contract performance and therefore cannot constitute actionable conduct under a fraud theory; (4) TaSM's claim against JCFS and JCI for tortious interference with the Subcontract; and (5) TaSM's claim for tortious interference with business expectancy. For the reasons stated below, the Motion is GRANTED as to TaSM's claim for contractual damages for the shipping and storage costs of rejected shelter units and TaSM's tortious interference with contract claim (Count 4) and is otherwise DENIED.

## I. BACKGROUND

Unless stated otherwise, the following facts are either undisputed or disputed facts viewed most favorably to TaSM:

Defendant JCBAS is a Delaware limited liability company that provides building systems and automation and energy savings solutions. Its sole member is Defendant JCFS and both entities are wholly owned subsidiaries of Defendant JCI. Around October 12, 2012, the Army issued a Request for Proposals ("RFP") in which sought goods and services in support of the Army's Kuwait Energy Efficiency Project (the "KEEP Project"). The RFP solicited energy efficient relocatable shelters for Camp Buehring, Kuwait, which the Army issued as a small business set aside. Given the Army's decision to set aside the procurement for small business, JCBAS could not serve as the prime contractor. JCBAS thus approached TaSM, a small business, and proposed that TaSM serve as the prime contractor, and JCBAS as the subcontractor. TaSM agreed; and on November 26, 2012, TaSM submitted its proposal in

response to the RFP. The Army awarded TaSM the KEEP contract on or around March 15, 2013. After several rounds of protests and a re-solicitation, the Army again selected TaSM's proposal and on September 27, 2013, awarded to TaSM Contract No. W15QKN-D-0113 (the "Prime Contract"). The Prime Contract was an "indefinite quantity, indefinite delivery" contract ("IQID") that had a guaranteed value of $10 million, with a total authorized "ceiling value" of $29,429,017. The Army issued Prime Contract Delivery Order 1 simultaneous with the Prime Contract award, which requisitioned 72 two-story shelter units for Camp Buehring at a total cost of $14,880,593.52. Overall, the Army has issued six fixed-price delivery orders to TaSM under the Prime Contract at a cost of $18,404,304.

In February 2014, TaSM and JCBAS executed the Subcontract for JCBAS to perform certain work required by the Prime Contract. Under Section 10(c) of the Subcontract, the parties waived any right to recover either incidental or consequential damages. In March 2014, TaSM and JCBAS entered Subcontract Delivery Order 0001 for JCBAS to deliver 72 two-story shelter units at a price of $174,000 each, for a total price of $12,528,000.

Following execution of the Subcontract, a dispute arose regarding JCBAS' performance, including the type of expanded polystyrene ("EPS") insulating materials that would be used in the panels of the shelters—specifically the extent to which Neopor, a specific type of EPS manufactured by BASF, was required under the Prime Contract and Subcontract. Eventually, JCBAS used Neopor for all exterior walls but another type of EPS, Styropor, for all internal dividers. TaSM learned of the use of Styropor, instead of Neopor, for the interior dividers in July 2014.

In September 2014, TaSM issued to JCBAS a "stop work order" based on TaSM's assessment of deficiencies in JCBAS' performance. That "stop work order" was eventually

lifted in October 2014 following a series of communications between the parties. On October 20, 2014, TaSM directed JCBAS to package and prepare for shipment all of the remaining materials for the two-story shelter units remaining to be fabricated under Subcontract Delivery Order 0001, which included all the materials for 36 of the 72 two-story shelter units. Thereafter, JCBAS began preparing to deliver the remaining materials due under Delivery Order 0001 that had yet to be delivered. In November 2014, TaSM picked up the remaining materials from JCBAS and shipped the units to Kuwait. On December 3, 2014, while the JCBAS materials were in transit to Kuwait, TaSM terminated JCBAS for default under the Subcontract and also rejected the materials in transit. Throughout this period, defendants' employees repeatedly contacted the Army directly concerning TaSM's performance and conduct with respect to the KEEP Project, even though its own contractual relationships pertaining to the shelters were solely with the TaSM.

Under the Subcontract, JCBAS had agreed to fabricate the rejected 36 two-story shelter units for approximately $6.6 million. After termination, TaSM contracted with Energy Efficient Building Systems, LLC ("EEBS") to provide the materials for those remaining 36 two-story shelter units at a cost of $5,721,581.02. EEBS is affiliated with TaSM and owned by TaSM principals. EEBS, in turn, subcontracted with Evia Operations S.a.R.L. ("Evia") to obtain the materials needed to fabricate the shelter units. Thereafter, Evia and its affiliate, IQ LLC, failed to perform under their contract with EEBS and were terminated. TaSM and/or EEBS then started a facility of their own in Virginia to produce the panels for the shelter units, which were eventually fabricated and delivered to the Army. TaSM has incurred over $10 million dollars in completing JCBAS' work under the Subcontract, either directly or through its affiliate EEBS.

Despite the amount remaining under the authorized spending ceiling of the Prime Contact, the Army has not ordered any further shelter units.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).

The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). Whether a fact is considered material is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

5

### III. ANALYSIS

#### A. Contract Damages Based on TaSM's Cost to Cover Following JCBAS' Termination

Defendants move to dismiss TaSM's claim for certain contractual damages first on the grounds that TaSM lacks standing to recover "cover" damages because any such damages were incurred by TaSM's affiliate EEBS, and not TaSM. In the alternative, defendants argue that even if TaSM had standing, there are no such recoverable damages because (1) TaSM was able to "cover" for an amount less than what it would have owed for the same work under the terminated Subcontract, relying substantially on the deposition testimony of TaSM's President William Jonas, who also founded and owned EEBS, that EEBS "never failed to perform on the" contract with TaSM; and (2) any other costs incurred for "cover" above the $5.5 million owed to EEBS are consequential damages incurred as a result of Evia's and/or EEBS's failure to perform as required under their respective contracts and are therefore waived under the Subcontract.

As an initial matter, TaSM has standing to pursue damages based on JCBAS' alleged breach of the Subcontract. "Standing is a threshold jurisdictional question which ensures that a suit is a case or controversy appropriate for the exercise of the courts' judicial powers under the Constitution of the United States." *Pye v. United States*, 269 F.3d 459, 466 (4th Cir. 2001). Standing is required for each claim, and "a plaintiff must demonstrate standing separately for each *form of relief* sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (emphasis added). Here, there is no dispute that TaSM has standing to pursue damages for any breach of the Subcontract, including "cover" damages, incidental damages, and consequential damages. The central issue here is not TaSM's standing to recover damages for JCBAS' alleged breach, but rather the measure of those damages incurred by TaSM as a result of any breach and whether TaSM incurred or waived any recoverable damages. With respect to those fact intensive

issues, the Court is unable to conclude as a matter of law based on the undisputed facts, and the disputed facts viewed most favorably to TaSM, that TaSM suffered no cognizable or recoverable damages based on its reprocurement efforts. For the same reason, the Court cannot conclude as a matter of law that all of TaSM's claimed damages are otherwise barred as consequential damages. In reaching this conclusion, the Court has considered centrally the legal standard applicable to TaSM's claim for damages.

Virginia's Uniform Commercial Code (the "Virginia UCC")[2] provides in relevant part that where

> the buyer rightfully rejects . . . then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (§ 8.2-612), the buyer may cancel and . . . may in addition to recovering so much of the price as has been paid (a) "cover" and have damages under the next section (§ 8.2-712) as to all the goods affected whether or not they have been identified to the contract; or (b) recover damages for nondelivery as provided in this title (§ 8.2-713).

Va. Code. Ann. § 8.2-711. Section 8.2-712(1) provides that "the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." If the buyer covers, it "may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (§ 8.2-715), but less expenses saved in consequence of the seller's breach." *Id.* § 8.2-712(2). But "[f]ailure of the buyer to effect cover within this section does not bar him from any other remedy." If the buyer fails to cover, then the damages are based on the difference between the market price and the contract price rather than the difference between the cost of cover and the contract price. *Id.* § 8.2-713(1); *see* 24 Williston on Contracts § 66:48 (4th ed.) ("The measure of damages specified in

---

[2] The parties do not dispute that the Virginia Uniform Commercial Code applies as Virginia law governs the Subcontract. *See* Defs.' Ex. 1, § 21(a).

this Code provision is intended to apply in situations where the buyer is not able to use a cover price as the basis for computing damages, such as because substitute goods cannot be obtained, or because the buyer has not procured such goods in a commercially reasonable way."). These fact intensive inquiries cannot be made as a matter of law based on the current record before the Court.

### B. Contract Damages Based on Costs Incurred by TaSM for Transportation and Storage of Materials Rejected

Defendants next argue that they are entitled to summary judgment with respect to TaSM's attempt to recover costs for the transportation and storage of the 36 two-story shelter units that were rejected. The Subcontract provides that "[n]either Party shall be liable to the other Party hereunder for any special, incidental, consequential or punitive damages resulting from any such breach or alleged breach of this Subcontract." Defs.' Ex. 1, § 10(c). Under the Virginia UCC, "incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected." Va. Code Ann. § 8.2-715(1).

TaSM argues that its "rejection triggered Section 30 of the Subcontract, which specifically incorporates by reference FAR 52.246-2." [Doc. No. 105 at 21.] That provision provides in relevant part:

> (g) [JCBAS] shall remove supplies rejected or required to be corrected. However, [TaSM] may require or permit correction in place, promptly after notice, by and at the expense of [JCBAS]. [JCBAS] shall not tender for acceptance corrected or rejected supplies without disclosing the former rejection or requirement for correction, and, when required, shall disclose the corrective action taken.
>
> (h) If [JCBAS] fails to promptly remove, replace, or correct rejected supplies that are required to be removed or to be replaced or corrected, [TaSM] *may either*
>   (1) by contract or otherwise, remove, replace, or correct the supplies and charge the cost to [JCBAS] *or*

8

      (2) terminate the contract for default.

FAR 52.246-2(g)-(h) (emphasis added).

  Here, TaSM simultaneously rejected the 36 two-story shelter units and terminated the Subcontract for a number of breaches, including the "failure to provide conforming goods and services under the subcontract." Plf.'s Ex. S. As such, the FAR provision incorporated by reference does not override the Subcontract's bar on incidental damages because TaSM chose to terminate the contract for default as its remedy, rather than exercise its right to "remove, replace, or correct the supplies and charge the cost to [JCBAS]." In any event, Section 29 of the Subcontract states: "If provisions of this Subcontract that are incorporated herein by reference rather than stated fully herein contradict provisions which are fully stated herein, such provisions set forth in full text herein shall control." Based on these provisions, the Court concludes as a matter of law (1) that the Subcontract provision barring the recovery of incidental damages controls over any incorporated FAR provision; (2) TaSM's claimed transportation and storage costs following its terminating the Subcontract for default and rejecting the tendered shelters constitute "incidental damages"; and (3) TaSM is barred under the Subcontract from recovering such incidental damages.

### C.  TaSM's Fraud Claim

  Under Virginia law, six independent elements must be proved by clear and convincing evidence to succeed on a fraud claim: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994). But misrepresentations that "relate[] to a duty or an obligation that was specifically required" by a contract "do not give rise to a cause of action for actual fraud."


*Richmond Metro. Auth. v McDevitt Street Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998); *see Dunn Const. Co. v. Cloney*, 682 S.E.2d 943, 946–47 (Va. 2009) (explaining that a duty based in contract cannot form the basis for a tort, including fraud). For this reason, a false representation about the performance of a contractual duty cannot form the basis of a fraud claim, whereas a false representation that precedes, and induces the creation of, a contract can, since it violates a duty that exists independent of the yet-to-be-formed contract. *See, e.g., Abi-Najm v. Concord Condo., LLC*, 699 S.E.2d 483, 490 (Va. 2010). Nevertheless, a "promisor's state of mind at the time he makes the promise is a fact," and thus a pre-contract misrepresentation about performance of an obligation "with a present intention not to perform" can form the basis of a fraudulent inducement claim. *Id.* (internal quotation marks omitted).

Based on the undisputed facts and the disputed facts viewed most favorably to TaSM, the Court cannot conclude that JCBAS is entitled to judgment as a matter of law in its favor on TaSM's fraud claim. The Court can, however, conclude as a matter of law that the alleged misrepresentations and concealment that occurred after the execution of the Subcontract do not constitute actionable fraudulent conduct, but are, at most, when viewed most favorably to TaSM, evidence of defendants' fraudulent intent not to perform the Subcontract at the time of its execution. Any false representation or concealment by defendants regarding JCBAS' performance of a contractual duty fails as a matter of law to establish TaSM's fraud claim.

C.  **TaSM's Tortious Interference Claims**

1.  **Tortious Interference with Contract by JFCS and JCI**

In Virginia, a claim for tortious interference with contractual performance has four elements: (1) "the existence of a valid contractual relationship"; (2) "knowledge of the relationship . . . on the part of the interferer"; (iii) "intentional interference inducing or causing a

10

breach or termination of the relationship"; and (4) "resultant damage to the party whose relationship . . . has been disrupted." *Lewis-Gale Med. Ctr., LLC v. Alldredge*, 710 S.E.2d 716, 720 (Va. 2011). Here, TaSM claims that JCFS and JCI interfered with TaSM's Subcontract with JCBAS and that interference caused JCBAS to breach that Subcontract.

JCFS is the only member of JCBAS; and the parties have stipulated that both are wholly owned subsidiaries of JCI. *See* [Doc. No. 66, ¶¶ 2-6 (Joint Stipulation of Uncontested Facts)]. JCFS and JCI are therefore properly viewed as "parents" of JCBAS. A parent company may be charged with tortious interference with a subsidiary's contract, but only if the interference is "contrary to the subsidiary's economic interest or . . . employs wrongful means." *Glasson v. Children's Surgical Specialty Grp., Inc.*, 73 Va. Cir. 480, 2007 WL 6013707, at *1 (2007) (citing *Waste Conversion Systems, Inc. v. Greenstone Industries, Inc.*, 33 S.W.3d 779 (Tenn. 2000) and *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029 (2nd Cir. 1995)); *cf. Lewis-Gale Med. Ctr., LLC*, 710 S.E.2d at 720 (contract terminable at will also requires proof that the defendant employed improper methods).[3] Here, TaSM does not claim that JCFS and JCI's alleged interference was contrary to JCBAS' economic interests and therefore must show that these defendants used improper methods to induce or cause JCBAS to breach its Subcontract with TaSM. *See, e.g., Boulevard Assocs.*, 72 F.3d at 1037 ("Tortious interference with contract requires the use of improper means to induce a party to breach the agreement; thus, [the parent's] actions had to intimidate [*its subsidiary*] rather than [the subsidiary's counterparty]."); *see also Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985) ("One who intentionally and improperly

---

[3] In connection with defendants' motion to dismiss [Doc. No. 15], the Court noted that the Supreme Court of Virginia had not yet addressed the issue whether a parent corporation could be liable for interference with its subsidiary's contract but predicted, pursuant to its obligation under *Erie*, that the Supreme Court of Virginia would adopt the holding in *Glasson*.

11

interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.") (quoting Restatement (Second) of Torts § 766 (1979)).

"Improper methods" include "those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules," and may include "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Lewis-Gale Med. Ctr.*, 710 S.E.2d at 721 (internal quotation marks omitted). "Methods also may be improper because they violate an established standard of a trade or profession, or involve unethical conduct. Sharp dealing, overreaching, or unfair competition may also constitute improper methods." *Id.* But courts have "have uniformly found that a parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform." *Waste Conversion Sys., Inc.*, 33 S.W.3d at 781 (quoting *Boulevard Assocs.*, 72 F.3d at 1029); *see also Zurich Am. Ins. Co. v. Turbyfill*, No. 7:10-cv-282, 2010 WL 4065527, at *4 (W.D. Va. Oct. 15, 2010) ("[H]olding that the mere encouragement for someone else to breach a non-compete clause was an 'improper method' sufficient to support a tortious interference claim would confound the Virginia Supreme Court's repeated attempts to prevent turning every breach of contract into an actionable tort claim.") (internal quotation marks omitted).

The only evidence TaSM identifies that is arguably aimed at inducing JCBAS to breach the Subcontract is that "Michael Tindall—whose email is michael.w.tindall@jci.com and email signature block variably refers to 'JCI,' 'JCFS,' and 'JCSS'—exercised undue influence over

JCBAS by claiming to be a fire alarm expert and encouraging JCBAS not to perform any work to bring the fire alarm system in conformance with applicable codes." [Doc. No. 105 at 35 (citing Plf.'s Exs. ZZ, AAA).][4] In these emails, Tindall explains in detail his view on certain issues that TaSM and the Army raised, and provides a proposed action plan with respect to the latter. Even viewing Tindall's emails in the light most favorable to TaSM, along with all reasonable inferences, they evidence, at most, JCFS and JCI's disagreement with TaSM as to what is required under the Subcontract. *Cf. Boulevard Assocs.*, 72 F.3d at 1037 ("[The parent] simply directed its subsidiary, as it could do through the appropriate channels of corporate command, to stop paying the rent."). The Court concludes based on the current record that TaSM has failed to present evidence sufficient as a matter of law for a reasonable fact finder to conclude that either JCFS or JCI used improper methods to cause JCBAS to breach the Subcontract.

### 2. Tortious Interference with Business Expectancy

Under Virginia law, a claim for tortious interference with business expectancy requires: (1) "the existence of a business relationship or expectancy, with a probability of future economic benefit"; (2) the defendant's "knowledge of the relationship or expectancy"; (3) "that it was reasonably certain that absent intentional misconduct, the claimant would have continued the relationship or realized the expectancy"; (4) that the defendant "employed improper means"; and (5) that the party with the expectancy "suffered damages from the interference." *Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001). "[P]roof of

---

[4] Among the other acts that TaSM identifies as constituting improper methods are the alleged fraudulent inducement of TaSM attributable to JCFS and JCI, letters from JCFS to TaSM blaming TaSM for performance problems in response to TaSM's correspondence to JCBAS identifying performance deficiencies, and statements in an email by an employee representing JCFS and/or JCI that made "false and defamatory statements to U.S. Army representatives about TaSM and its performance under the Prime Contract." None of this allegedly improper conduct evidences either defendants' inducing *JCBAS* to breach the Subcontract through improper methods.

the existence of the first and third elements of the tort must meet an objective test; proof of subjective expectations will not suffice." *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 897 (Va. 1997).

TaSM claims that defendants tortiously interfered with its business expectancy of additional orders under the Prime Contract for more shelters costing the approximately $11 million that remained under the Prime Contract's ceiling and also for a Combined Aid Station costing approximately $2.5 million. Although the Army ultimately did not buy either additional shelters or the Combined Aid Station from anyone, TaSM claims that it did not receive those work orders from the Army because defendants "committed fraud on TaSM and the Army and repeatedly made false and disparaging statements about TaSM to the Army."

The current record reflects a concentrated effort on defendants' part to communicate directly with the Army over the subject matter of the Subcontract, even though its own contractual relationships pertaining to the shelters were solely with TaSM. Based on the current record, viewing the evidence and all reasonable inferences in a light most favorable to TaSM, the Court cannot conclude that as a matter of law that defendants are entitled to judgment on TaSM's tortious interference with business expectancy claim.

## IV.   CONCLUSION

For these reasons, it is hereby

ORDERED that defendants' Motion for Partial Summary Judgment [Doc. No. 97] be, and the same hereby is, GRANTED IN PART AND DENIED IN PART. It is GRANTED as to plaintiff's claim for contractual damages based on the costs it incurred for transportation and storage associated with the rejected shelters and plaintiff's tortious interference with contract claim (Count 4); and it is otherwise DENIED.

The bench trial will proceed as scheduled on January 10, 2017. The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
January 4, 2017