IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TECHNOLOGY AND SUPPLY          )
MANAGEMENT, LLC,               )
                               )
            Plaintiff,         )
                               )
v.                             )          Civil Action No. 1:16-cv-303 (AJT/MSN)
                               )
JOHNSON CONTROLS BUILDING      )
AUTOMATION SYSTEMS, LLC, *et al.*, )
                               )
            Defendants.        )
_____)

## MEMORANDUM OF DECISION AND ORDER

This government procurement, diversity case arises out of a subcontract (the

"Subcontract") between Plaintiff/Counterclaim Defendant Technology and Supply Management,

LLC ("TaSM") and Defendant/Counterclaimant Johnson Controls Building Automation

Systems, LLC ("JCBAS").  Under the Subcontract, JCBAS was to provide the materials

necessary to assemble onsite at Camp Buehring, Kuwait, energy efficient shelters that TaSM was

obligated to deliver under its prime contract with the Army.  TaSM terminated the Subcontract

for default on December 3, 2014 and filed this action on March 18, 2016 against JCBAS and its

affiliates, Johnson Controls Federal Systems, Inc. ("JCFS") and Johnson Controls, Inc. ("JCI")

(collectively, "Johnson" or "Defendants").  TaSM's claims against Defendants are (1) breach of

the Subcontract against JCBAS (Count I), (2) breach of warranty against JCBAS (Count II), (3)

tortious interference with business expectancy against JCBAS, JCFS, and JCI (Count III), and

(4) fraud against JCBAS, JCFS, and JCI (Count V).[1]  JCBAS asserts a Counterclaim against TaSM for (1) breach of the Subcontract (Count I), and (2) breach of the implied covenant of good faith and fair dealing (Count II).  The case was tried without a jury on January 10-12 and 17-18, 2017, with closing arguments on February 1, 2017.

Based on the Court's assessment of the evidence presented, the Court finds (1) in favor of JCBAS on Counts I and II of the Complaint; and (2) in favor of JCBAS, JCFS, and JCI on Counts III and V of the Complaint.  As to the Counterclaim, the Court finds (1) in favor of JCBAS on Count I of the Counterclaim for breach of the Subcontract and awards damages in the amount of $6,599,223; and (2) in favor of TaSM on Count II of the Counterclaim for breach of the implied covenant of good faith and fair dealing.  Based on these findings, the Court will enter judgment in favor of JCBAS and against TaSM in the amount of $6,599,223.  In support of this verdict, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  Findings of Fact

Based on all the evidence presented at trial, including the Court's assessment of the credibility of witnesses and the weight to be given each piece of evidence, the Court finds as follows:

1. TaSM is a Virginia limited liability company owned by Joseph Lopez, Stephen Loftus, William Jonas, and Marina Burgstahler, who also serves as TaSM's Chief Operating Officer. None of TaSM's members are citizens of Delaware, Maryland, or Wisconsin.

---

[1] On January 4, 2017, the Court dismissed on summary judgment TaSM's Count IV against Defendants JCFS and JCI for tortious interference with contract [Doc. No. 136].

2. JCBAS is a Delaware limited liability company.  JCBAS' sole member is JCFS, a Delaware corporation with its principal place of business in Gaithersburg, Maryland.  Both JCBAS and JCFS are wholly owned subsidiaries of JCI, a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin.

3. On or about October 12, 2012, the U.S. Department of the Army (the "Army") issued Request for Proposals No. W15QKN-12-R-0070 (the "RFP"), seeking goods and services in support of the Army's Kuwait Energy Efficiency Project ("KEEP").  The objective of the RFP was to procure energy-efficient, rigid-walled, relocatable shelters for Camp Buehring, Kuwait ("KEEP shelters").

4. The RFP was issued as a small business "set-aside," to be awarded only to a company that qualified as a small business under federal regulations.

5. Johnson had worked with two other companies, Insolutions and Premium Steel, to develop a modular energy efficient structure ("MEES") that could be used by the United States Military in projects like KEEP; and after the release of the RFP, JCBAS proposed to TaSM that TaSM submit a bid as the prime contractor, with JCBAS as its subcontractor.  TaSM agreed to this proposal; and TaSM submitted a response to the RFP that included a technical volume drafted by JCBAS with some revisions by TaSM.

6. On or about September 27, 2013, the Army selected TaSM as the prime contractor and awarded TaSM Contract No. W15QKN-D-0113 (the "Prime Contract"), a Firm-Fixed-Price Indefinite-Delivery/Indefinite-Quantity Agreement with a minimum guaranteed value of $10 million, a total ceiling value of $29,429,017, and a two-year period of performance.[2]

---

[2] The Army initially selected TaSM as the prime contractor and awarded it a prime contract for KEEP around March 15, 2013, following which multiple other competing companies protested the award, causing the Army to cancel TaSM's award, amend the solicitation, and receive revised proposals from each of the original bidders. TaSM

3

7.   The Prime Contract provided that the Army would procure one- and two-story KEEP shelters and related services through delivery orders to the extent of the Army's need during the period of performance. The Army placed Delivery Order 0001 under the Prime Contract when it issued the Prime Contract.

8.   Under Delivery Order 0001, TaSM was obligated to deliver to the Army at Camp Buehring, Kuwait, 72 two-story, fully assembled KEEP shelters for a total cost of $14,880,593.52.  Six of the two-story KEEP shelters were to be "ganged" together to make a single building (a "KEEP building"); and Delivery Order 0001 therefore consisted of twelve KEEP buildings.

9.   On February 17, 2014, after the Army authorized TaSM to resume work under the Prime Contract,[3] the Army and TaSM entered into Modification 01 to Delivery Order 0001, which established a delivery and progress-payment schedule.  Under this schedule, TaSM's assembly and the Army's acceptance of the KEEP buildings in Kuwait was to be completed on a rolling basis starting on September 4, 2014, with the first six KEEP buildings assembled and accepted by October 27, 2014 and all twelve KEEP buildings assembled and accepted by December 15, 2014.

10.   The Army's progress payments to TaSM under the Prime Contract were based on TaSM's satisfying certain milestones.  Based on those milestones, the Army's first payment of $561,825 (3.78% of Delivery Order 0001) was scheduled to occur upon ATEC inspection and certification on May 26, 2014.  The next payment of $948,366 (6.37% of Delivery Order 0001) was scheduled to occur upon arrival of the material for the first six two-story KEEP shelters to the port in Norfolk, Virginia, on June 2, 2014.  Thereafter, payments of roughly

---

submitted a revised proposal on June 13, 2013 (with a revised technical volume again drafted by JCBAS with some revisions by TaSM).

[3] The Army received another protest on October 16, 2013 and instructed TaSM to stop work on the Prime Contract and Delivery Order 0001.  The Army authorized TaSM to resume work around January 13, 2014.

7.5% of Delivery Order 0001 were scheduled to occur as certain materials for the two-story
KEEP shelters arrived at the Norfolk port, with the last of these materials scheduled to arrive
at the port by August 18, 2014, at which time the Army was scheduled to have paid TaSM
approximately 77% of Delivery Order 0001, or approximately $11,500,000.  The Army was
then scheduled to pay TaSM approximately $280,000 (1.89% of Delivery Order 0001) upon
completion and acceptance of each KEEP building in Kuwait.  Thus, the payment scheduled
contemplated that TaSM would receive full payment of the Prime Contract Delivery Order
0001 price, $14,880,593.52, by December 15, 2014, the date by which the Army was
scheduled to accept the last KEEP building.

## The Subcontract

11. On February 11, 2014, TaSM and JCBAS entered into a Firm-Fixed-Price Indefinite-
Delivery/Indefinite-Quantity Subcontract Agreement, Subcontract No. W15KQN-13-
JCBAS-1013 (the "Subcontract"), with an effective date of February 7, 2014, under which
JCBAS was to perform certain work required by the Prime Contract.  Briefly summarized,
JCBAS was responsible for manufacturing the two-story KEEP shelters, packing their
components into shipping containers, tendering delivery of the containers to TaSM at
JCBAS' facility in Dublin, Virginia, and training TaSM personnel in Virginia and Kuwait on
assembling the two-story KEEP shelters.  TaSM was responsible for shipping the containers
from Dublin, Virginia, to Camp Buehring, Kuwait, and assembling the two-story KEEP
shelters onsite at Camp Buehring.  TaSM, as the prime contractor, was also the point of
contact with the Army for KEEP.

12. As with the Prime Contract, the Subcontract itself did not direct that any specific goods or services be provided.  Rather, TaSM was required to issue delivery orders to JCBAS for specific work.

13. Reflecting the scope of Prime Contract Delivery Order 0001, TaSM issued Subcontract Delivery Order 1 ("DO1") for 72 two-story KEEP shelters, with a firm-fixed price of $174,000 each, for a total DO1 price of $12,528,000.  Although DO1 had an effective date of March 28, 2014, JCBAS did not execute DO1 until April 30, 2014, and TaSM did not execute DO1 until May 23, 2014, approximately three weeks later.  However, JCBAS and TaSM began performing under the Subcontract and DO1 before their respective executions of DO1.

14. DO1 included a Statement of Work (the "SOW"), which incorporated the June 5, 2013 KEEP Performance Work Statement (the "PWS").  It also incorporated the June 12, 2013 Technical Proposal submitted to the Army (the "Technical Proposal") as well as the responses to the Army's Evaluation Notices that followed.  These documents included more detailed Subcontract requirements.  For example, the SOW provided that JCBAS would provide in its shipment the tools required to assemble the shelters (although as TaSM recognized in April 2014, "material handling equipment" was TaSM's responsibility).  The Technical Proposal provided that a two-story KEEP shelter could be assembled in three days by a four-person installation team consisting of three low-level workers and one more experienced worker; and that TaSM would have at least three of these installation teams (and potentially up to 10 teams under an expedited schedule), two supervisors onsite to unload the equipment, stage the assembly site, and manage the installation teams, and a "site lead" to oversee the project.

15. DO1 incorporated a payment schedule based on milestones that corresponded to that in the Prime Contract.  Thus, when the Army paid a certain percentage of Prime Contract Delivery Order 0001's value for a particular milestone, TaSM was to pay JCBAS the same percentage of Subcontract DO1's value.  Under the Subcontract, JCBAS was to invoice TaSM based on the dates set for those milestones (*viz.*, ATEC inspection; delivery of shelter materials to the port in Norfolk, Virginia; and post-assembly-and-inspection acceptance by the Army in Kuwait).  TaSM's payments to JCBAS under Subcontract were to be made five to seven business days after the Army paid TaSM under the Prime Contract.

16. Relevant portions of the Subcontract are listed in Appendix A to this Memorandum of Decision and Order and include, *inter alia*, provisions on "Warranty," "Inspection/Acceptance," "Acceptance criteria," "Packaging," "Termination," "Documentation and Manuals," and "Training support."

### **Neopor / Styropor**[4]

17. Neopor is the brand name for the insulating material, expanded polystyrene ("EPS"), manufactured by BASF.  Styropor is a generic EPS that is similar to Neopor. The Prime Contract does not specifically require that Neopor be used instead of Styropor.  However, the Technical Proposal, incorporated into the Subcontract through DO1's SOW, specifically identifies Neopor as the material to be used in "wall, floor and roof . . . panels" of the shelter.

18. Initially, in mid-2013 when JCBAS drafted the Technical Proposal and its pricing proposal to TaSM, JCBAS intended to use Neopor in all the panels of the KEEP shelters and priced its services to TaSM based on this assumption.  At this time, the price proposal of Premium

---

[4] Also pending is TaSM's Motion to Expand the Trial Record [Doc. No. 182] with respect to certain notes from a March 28, 2014 design review meeting between TaSM and JCBAS that may have included discussion about the use of Styropor.  The Court hereby grants this motion and has considered the supplemental evidence TaSM submitted.

Steel, the subcontractor which manufactured the panels for JCBAS, was also based on the use of Neopor in all the panels.

19. Around late 2013 or early 2014, JCBAS learned that, due to a possible supply shortage, the amount of Neopor necessary for production of the panels under the Subcontract and DO1 might not be available; and JCBAS instructed Premium Steel to calculate its final pricing for the panels based on the use of Styropor, without amending its proposal to TaSM.

20. On February 14, 2014, JCBAS requested that TaSM approve the use of Styropor instead of Neopor in the panels, citing the lack of material availability and potential production delays by using Neopor.  TaSM, in turn, made that substitution request to the Army on March 4, 2014, but withdrew it on March 12 after TaSM concluded that Neopor performed better than Styropor and that the necessary quantities of Neopor were available.  However, by March 31, 2014, TaSM recognized that there was a supply shortage of Neopor that would likely delay production of the panels and requested that the Army delay the ATEC inspection for that reason.

21. Notwithstanding the lack of any approvals to use Styropor instead of Neopor, JCBAS decided around mid-March 2014 to use Neopor only in the exterior panels and Styropor in the interior wall panels.  In late March, JCBAS paid Premium Steel the additional $31,050 that it cost to use Neopor instead of Styropor in all the exterior wall, floor, and roof panels (but not the interior panels).

22. By July 2014, at the latest, TaSM had learned that Styropor had been used to manufacture the interior wall panels; and TaSM and JCBAS renewed their request to the Army to use Styropor (this time only in the interior panels).  The Army accepted this substitution on July 28, 2014, without requiring any form of compensation or consideration in return.

**First Cure Notice**

23. The working relationship between TaSM and JCBAS quickly hit rough waters.  On April 30, 2014, the same day that JCBAS signed DO1 and approximately three weeks before TaSM signed DO1, TaSM issued the first cure notice to JCBAS (the "First Cure Notice").  The First Cure Notice stated that JCBAS had not timely provided requested data and had missed meetings with TaSM and the Army.  Even though it had not yet signed DO1, which was required to secure work under the Subcontract, TaSM advised JCBAS that it would terminate JCBAS for default if JCBAS did not remedy the conditions within seven days.

24. On May 5, 2014, JCBAS responded to the First Cure Notice.  In its response, JCBAS informed TaSM that it would assign an additional person to the project, Charlie Carter, to ensure adequate attendance at meetings and timely communications.  TaSM found JCBAS' response acceptable; and on May 19, 2014, TaSM canceled the First Cure Notice.

**ATEC Building Inspection**

25. As part of the SOW, JCBAS was required to produce and assemble in Dublin, Virginia, for inspection by the Army Test and Evaluation Command ("ATEC"), three "ganged together" two-story KEEP shelters (*i.e.*, half of one of the six-shelter KEEP buildings) (the "ATEC building").  After the Army's initial inspection, JCBAS was to make all corrections required to receive ATEC certification.  The ATEC building was to remain in Dublin, Virginia, for training purposes after certification, eventually to be disassembled and sent to Kuwait for reassembly as one half of the twelfth and final KEEP building under DO1.

26. The ATEC inspection was initially scheduled for May 15, 2014.  Due to JCBAS' inability to secure certain materials to manufacture the shelters, that inspection was first delayed until May 22, 2014, and then postponed again to June 3, 2014.  In the three weeks leading up to

the June 3, 2014 inspection, JCBAS and its subcontractor Premium Steel[5] assembled the

ATEC building at JCBAS' facility in Dublin, Virginia.

27. Several TaSM personnel were onsite in Dublin, Virginia, during the assembly of the ATEC

building, including Donnie Munro, who was present for the entire three-week assembly

process, and Eddie Perez who was present during portions of the assembly.  As part of the

assembly, panel skins were attached to the panels containing both Neopor, which presented

as a gray color, and Styropor, which presented as a white color.  TaSM personnel present

observed panels with both Neopor and Styropor before the skins were attached.

28. Although the ATEC building was not completely assembled, the Army inspected the

building on June 3, 2014 and then sent TaSM its preliminary findings, which contained a

number of issues that needed to be addressed.  TaSM forwarded those issues to JCBAS on

June 16, 2014; and on June 17, 2014, JCBAS responded to TaSM with a plan to address the

Army's concerns.

29. On October 1, 2014, the Army sent TaSM the final ATEC inspection report, dated September

25, 2014, which concluded that the shelters passed the inspection, although the report noted

that "this Safety Confirmation is based on the assertion that Soldiers will not setup, maintain,

or teardown the KEEP MEES."  Def. Ex. 151.  TaSM sent JCBAS this report on October 29,

2014.

### Performance Following the ATEC Inspection

30. On June 25, 2014 (rather than June 2, 2014, as projected under the Prime Contract), JCBAS

delivered to TaSM in Dublin, Virginia, the first containers of two-story KEEP shelter

---

[5] Premium Steel had been involved in the MEES design, held patents on certain aspects of the shelter technology, and manufactured the panels that made up the roof, floor, and wall panels of the two-story KEEP shelters.

materials, which TaSM then shipped to Kuwait by way of the port in Norfolk, Virginia.[6]

31. The containers that JCBAS delivered to TaSM for shipment deviated from the packaging requirements outlined in the Subcontract and otherwise presented problems for TaSM. Specifically, because of delays in the supply of "skins" for the shelter panels, JCBAS did not package a single two-story KEEP shelter into two containers. The early shipments also contained packing lists that did not plainly describe the contents of the containers. The materials in JCBAS' early shipments also were not palletized, or were insufficiently palletized, and were not sufficiently secured for the sea voyage to Kuwait, which caused damage to some components. As a result, TaSM had to spend more time in Kuwait than would have otherwise been required for unloading, identifying, and sorting the materials that arrived in the containers. For example, some support beams had to be unloaded by hand, and TaSM employees had to reconcile multiple packing lists to determine the type and quantity of components in each shipment. JCBAS and TaSM eventually developed a matching system that helped streamline the identification and tracking of container contents in later shipments; and JCBAS corrected the palletizing issues.

32. On July 16, 2014, TaSM issued to JCBAS a notice of costs and damages and, the following day, a second cure notice (the "Second Cure Notice"). Both documents outlined how TaSM considered JCBAS out of compliance with the Subcontract, including JCBAS' use of Styropor in the interior walls; delays and deviation from the shipment schedule; not shipping KEEP building three in a single shipment; not providing detailed shipping documents; not providing all of the tools necessary to assemble the two-story KEEP shelters; not allowing a

---

[6] Certain subcontractors and second-tier subcontractors played significant roles for both TaSM and JCBAS in the packaging and shipping process. JCBAS' subcontractor, The Burnell Group, was involved with packaging the two-story KEEP shelter materials into the shipping containers. Zust Bachmeier ("Zust") served as TaSM's shipping subcontractor. Zust engaged trucking company IMS Transport to pick up the containers from JCBAS' facility in Dublin, Virginia, and transport them to the port in Norfolk, Virginia, to be loaded on a ship for Kuwait.

TaSM quality control representative onsite at JCBAS' facility; and not completing the ATEC building for inspection.  The Second Cure Notice demanded that JCBAS remedy the deficiencies within seven days, allow TaSM to place a quality assurance employee at the Virginia facility, and compensate TaSM for the costs incurred as a result of the asserted contractual breaches.

33. Around July 24, 2014, the parties met in-person to discuss a resolution of the issues identified in the Second Cure Notice.  They subsequently disputed whether an oral agreement was reached at that meeting for the purpose of lifting the Second Cure Notice; but on July 25, 2014, TaSM, through its general counsel, emailed JCBAS a proposed written agreement with terms and conditions for lifting the Second Cure Notice.  That proposed written agreement states, *inter alia*:

> 3.  Johnson shall provide all tools required for the assembly of the buildings.  Johnson shall provide sufficient tool [sic] for the installation teams to erect the buildings. . . .

> 7.  Costs incurred by TaSM due to the delays of Johnson shall be borne by Johnson.  This includes:
>     a. Costs due to only shipping 5 days per week instead of the agreed upon 6 days per week.  This cost is $51,140.00.
>     b. Costs due to TaSM having to cancel shipments after the shipment had been scheduled and received extremely late or no notice that the shipments weren't ready.  This cost is $5,000.00.
>     c. Costs of having to provide tools if #3 is not agreed to.  This cost is $56,918.68.
>     d. Costs of having to replace the interior panels made with Styropor if the government will not accept the Styropor panels.  If the government requires compensation in exchange for accepting the Styropor panels, Johnson will be required to reimburse the costs thereof.

Pl. Ex. 184.

34. JCBAS did not respond specifically to this proposed agreement but did dispute that JCBAS had breached the Subcontract as claimed in the Second Cure Notice.  In turn, on August 1, 2014, TaSM notified JCBAS that the cure period had expired; that because JCBAS failed to comply with the requirements of the Second Cure Notice, it would not be lifted; and that the

Subcontract was subject to termination at any time.  On August 8, 2014, JCBAS again disputed that it had breached the Subcontract.

35. Although TaSM never officially lifted the Second Cure Notice, the parties continued to work together to deliver and assemble the shelters.  For approximately three weeks in late August and early September 2014, JCBAS and Premium Steel representatives went to Camp Buehring, Kuwait, to train TaSM and its labor force on how to assemble the KEEP buildings. In addition to three TaSM employees (Eddie Perez, Donnie Munro, and Carlos Viera), about a dozen technically unskilled Kuwaiti nationals hired by TaSM (known as "TCNs") also received training.  By the time the training was completed, approximately 75% of the first KEEP building (consisting of six two-story KEEP shelters) had been completed.

36. By early September 2014, JCBAS had delivered to TaSM 92 containers with substantially all of the required materials for 36 two-story KEEP shelters as well as some additional materials for the final 36 shelters.

37. Following the training, disputes continued between TaSM and JCBAS concerning the length, quality, and thoroughness of training, including specifically the adequacy of the training with respect to the installation of certain aspects of the roofs, doors, electrical equipment, and fire alarm systems.

38. During its assembly of the first 36 two-story KEEP shelters, TaSM experienced assembly difficulties in the following respects:

    a. Unloading, sorting, and tracking the materials from the containers.

    b. Assembling the two-story KEEP shelters with unskilled laborers with minimal hand tools; and the lack of all tools required to assemble the shelters in the shipments.

c.  Properly connecting the panels to the support beams (referred to as trusses or I-beams), which TaSM contended were cut to incorrect lengths, but which JCBAS contended were actually cut to correct lengths, given that the shelters were designed with certain spaces between panels, as reflected in updated drawings JCBAS provided to TaSM in September 2014.

d.  Sealing the exterior seams between certain panels, which were to be covered with a metal bracket and then covered with VentureClad tape, and the interior seams, which were to be covered with adhesive t-astragals.  Eventually, due to the heat in Kuwait, some of these metal brackets covering the exterior seams buckled, pulling away from the shelter and unpeeling the tape used to seal the seam.  Similarly, some of the t-astragals used to seal the interior seams in the shelters were adversely affected by the Kuwaiti environment and would not attach to the interior side of the panels.  TaSM found inadequate the JCBAS-provided procedures and/or products to fix these sealing issues.

e.  Addressing the effects of oxidized floor panels, which had severe discoloration but no structural issues.

f.  Installing the electrical equipment because of, among other issues, wire lengths.

39. On September 10, 2014, following JCBAS and Premium Steel's training trip, TaSM sent JCBAS a stop work order that directed JCBAS to cease work on the project, citing various alleged performance deficiencies and technical problems with the shelters (the "Stop Work Order").  The Stop Work Order also informed JCBAS that it would not receive any payments while work was stopped.  Questioning why TaSM had failed to raise these issues sooner, JCBAS disputed TaSM's ability to issue such an order and to withhold payment on that

14

basis.  JCBAS also provided responses to each of the technical deficiencies raised in the Stop

Work Order.

40.  In an effort to resolve the issues raised in the Stop Work Order, the parties exchanged

correspondence and, with Premium Steel representatives, participated in conference calls.

But these efforts did not resolve all of the issues.  In two letters sent September 24, 2014,

TaSM gave JCBAS until September 30, 2014 to provide certain written assurances, without

which TaSM would terminate the Subcontract.

41. On October 7, 2014, following another response from JCBAS, TaSM informed JCBAS that

the Stop Work Order remained in place.

42. On October 15, 2014, TaSM sent JCBAS a letter provisionally lifting the Stop Work Order

on two conditions:  (1) that JCBAS correct, fix, or replace all problems under the Subcontract

within forty-five days of October 16, 2014; and (2) that JCBAS ensure that a representative

of its subcontractor Premium Steel be onsite in Kuwait at all times until the two-story KEEP

shelters were fully completed and accepted by the Army.

43. On October 16, 2014, JCBAS committed to correcting, fixing, or replacing the problems with

the two-story KEEP shelters to the satisfaction of TaSM and the Army within forty-five days.

It also advised TaSM that representatives from JCBAS and Premium Steel would be

"available for immediate return to the [Kuwait]" to ensure these fixes, although Premium

Steel would not be "available for continuous representation in Kuwait in support of this

project."  Pl. Ex. 251.  In addition to JCBAS' formal response, on October 16, 2014, JCBAS'

Charlie Carter emailed TaSM to explain that Juan Lozano, JCBAS' fire alarm system expert,

was available to return to Kuwait immediately, and that Premium Steel's Danny Feazell

15

would return as soon as his prior travel and work schedule allowed.  He also advised TaSM

that he would travel back to Kuwait the first week of November.

44. Following JCBAS' response, TaSM reassessed how to proceed in order to complete the

shelters.  Rather than working with JCBAS as TaSM had outlined in its October 15, 2014

letter to JCBAS provisionally lifting the Stop Work Order, TaSM, through its Chief

Operating Officer, Marina Burgstahler, informed the Army in an October 19, 2014 email that

TaSM planned to instruct JCBAS to ship all the remaining materials under the Subcontract

and DO1, but thereafter TaSM would fix and assemble the shelters in Kuwait without

JCBAS' assistance.

45. Following through on this action plan, on October 20, 2014, TaSM sent JCBAS another letter

(dated October 17, 2014) that (1) officially lifted the Stop Work Order; (2) directed JCBAS

to "package and prepare for shipment all of the materials for all of the structures remaining

on the subcontract" and replacement parts; (3) informed JCBAS that "[i]f TaSM requires

JCBAS's assistance in Kuwait, TaSM shall notify JCBAS in writing two (2) weeks prior to

JCBAS being required in Kuwait"; and (4) directed JCBAS to "provide the information,

regarding the units ready to ship, no later than 4:00 PM Wednesday, October 22, 2014."  Pl.

Ex. 255.

46. JCBAS responded by letter on the same day, October 20, 2014, agreeing to deliver the

remaining items.  Separately on October 20, 2014, Charlie Carter, ostensibly not realizing

that TaSM had changed course, emailed TaSM and the Army regarding the upcoming arrival

dates to Kuwait for Juan Lozano (October 28), and him and Danny Feazell (November 4).

The next day, October 21, 2014, Marina Burghstahler advised Carter that no JCBAS or

Premium Steel employee except Juan Lozano was authorized to be onsite in Kuwait.  She

reiterated that TaSM would notify JCBAS two weeks in advance if TaSM required anyone else from JCBAS onsite in Kuwait and that TaSM "will resolve all issues associated with the structure from this point forward."  Def. Ex. 193.

47. On October 27, 2014, TaSM directed JCBAS to have all remaining materials to be delivered under the Subcontract and DO1 ready for pickup in Dublin, Virginia, no later than November 21, 2014.  JCBAS confirmed it would do so.

48. JCBAS proceeded as TaSM requested; and by November 25, 2014, TaSM had picked up 51 more containers from JCBAS' Dublin, Virginia, facility after lifting the Stop Work Order, bringing the total number of containers that JCBAS delivered to TaSM under the Subcontract and DO1 to 143.  These 51 containers included all materials that JCBAS was to provide under the Subcontract and DO1.[7]  Contrary to TaSM's claim, JCBAS did not fail to tender deliver of these containers by the agreed-upon date of November 21, 2014.[8]

49. On December 1, 2014, the final containers with JCBAS materials left the port in Norfolk on a ship bound for Kuwait.  *Id.*

50. The next day, December 2, 2014, with the last of the two-story KEEP shelters on their way to Kuwait by sea, TaSM informed the Army that TaSM intended to terminate JCBAS and use

---

[7] While the parties originally anticipated that all materials under the Subcontract and DO1 would be shipped in 144 containers, the materials ultimately required only 143 containers, as confirmed in a November 19, 2014 email from The Burnell Group, *see* Pl. Ex. 297 ("143 containers were needed to ship KEEP DO-1."), and a December 4, 2014 email from TaSM's Chief Financial Officer, *see* Def. Ex. 246 (stating that TaSM "ha[s] shipped all the materials that we have on order from JCI for the 12 shelter [buildings]").

[8] JCBAS had the containers ready for pick-up by November 21, 2014.  However, IMS Transport, the trucking company working for TaSM (through TaSM's shipping subcontractor, Zust) did not pick up the last of the containers until November 25, 2014 due to its schedule.  In any event, that delay was inconsequential since IMS Transport delivered the containers to the port in Norfolk well before the ship's scheduled departure date of November 30, 2014; and the ship did not in fact depart until December 1, 2014.

its other subcontractor, IQ, LLC,[9] to complete the second 36 two-story KEEP shelters under the Subcontract and DO1.

51. By letter dated and sent December 3, 2014, TaSM terminated the Subcontract for default effective immediately and purported to reject, sight unseen, the 51 containers that JCBAS had just delivered as TaSM directed.  In particular, the letter stated:  "All containers of building parts that are currently in transit or that are sitting in Kuwait will be returned by TaSM to the JCBAS offices.  JCBAS will be liable for paying the costs that TaSM incurs in returning these to JCBAS."  Pl. Ex. 310.

52. The 51 containers arrived in Kuwait; but notwithstanding its stated intention in its termination notice to return those containers, TaSM did not return the 51 containers or any of the materials that had previously arrived in Kuwait.  Rather, while the final containers were still in shipment in December 2014, TaSM had decided to use from these last JCBAS shipments at least the stairs, stair extensions, fire escapes, fire alarm systems, and paint.  TaSM later decided to use the HVACs and electrical equipment from these shipments as well.  Ultimately, TaSM in fact used tens of thousands of parts from the shipments that contained the materials for the second 36 two-story KEEP shelters.  TaSM also used parts from these shipments from JCBAS for the *single-story* KEEP shelters that it was providing at Camp Buehring under the Prime Contract through its other subcontractor, IQ, LLC.  After TaSM's selective use of the materials from the shipments that JCBAS had delivered, including the last 51 containers, there were insufficient materials remaining to assemble a single two-story KEEP shelter.

---

[9] TaSM had subcontracted with IQ, LLC, in a separate delivery order under the Prime Contract with respect to single-story KEEP shelters in Kuwait.

53. TaSM has not identified any defects or nonconformities with respect to the shipments of materials for the second 36 two-story KEEP shelters; and as of the date on which TaSM terminated the Subcontract, December 3, 2014, JCBAS had delivered all materials ordered under the Subcontract and DO1.

54. As of December 4, 2014, the day after termination, TaSM determined that: (1) JCBAS had delivered all the materials due under the Subcontract; (2) TaSM had completed assembly of three KEEP buildings, although they had not been inspected or accepted by the Army; and (3) TaSM's total cost through November 2014 in assembling those KEEP buildings was $491,388, consisting of direct labor costs of $228,110, travel costs of $87,781, and other direct costs of $175,497, some which TaSM believed were attributable to JCBAS' deficiencies.

55. By approximately March 13, 2015, TaSM had substantially completed the first six KEEP buildings but could not test the fire alarm systems because the Army had not yet connected communication lines to Pad 9 at Camp Buehring, the location of the two-story KEEP shelters.[10]  Those communication lines were eventually established.

56. On June 13, 2015, the Army accepted, without any qualification or reservation as to any deficiencies, the first six KEEP buildings that were assembled by TaSM with the materials provided by JCBAS.

57. The Army's acceptance of the first six KEEP buildings was delayed because of the Army's delay in establishing power and communication lines to Pad 9.

---

[10] The Army experienced delays in getting power and communication lines to certain areas of Camp Buehring, including Pad 9.  Power lines reached the first six KEEP buildings around March 8 or 9, 2015, which allowed TaSM to test the HVACs and electrical equipment, as required, but TaSM could not test the fire alarm systems, as required, until the communication lines reached the KEEP buildings.

58. Following the Army's acceptance of the first six KEEP buildings, TaSM had no further

maintenance or other obligations with respect to those structures, other than under the

applicable warranties.

**Orders and Payments Under the Prime Contract and the Subcontract**

59. On August 6, 2014, JCBAS invoiced TaSM for the first milestone (ATEC inspection and

certification). Throughout August 2014, JCBAS invoiced TaSM for the shipped two-story

KEEP shelters based on the milestone payments set forth in the Prime Contract and

Subcontract.  By August 29, 2017, JCBAS had submitted seven invoices to TaSM, totaling

$5,928,777, consisting of milestone payments for the ATEC inspection and for the delivery

of 34 two-story KEEP shelters.  On October 6, 2014, JCBAS issued another invoice for

$931,474 to TaSM for the delivery of another seven two-story KEEP shelters, bringing to

$6,860,251 the total amount JCBAS had invoiced TaSM.

60. On September 9, 2014, the Army paid TaSM $2,616,554 for the first three milestones under

Prime Contract Delivery Order 0001—the ATEC inspection and delivery of 13 two-story

KEEP shelters to the port in Norfolk, Virginia.  The following day, September 10, 2014 (the

same day TaSM issued the Stop Work Order to JCBAS), the Army paid TaSM another

$2,212,785 for two more milestones (the delivery of 14 more two-story KEEP shelters).  By

September 30, 2014, the Army had paid TaSM a total of $7,042,123 under Prime Contract

Delivery Order 0001, consisting of milestone payments for the ATEC inspection and

delivery of 34 two-story KEEP shelters.

61. TaSM lifted the Stop Work Order on October 20, 2014, but by late-October 2014, had not

paid JCBAS anything under the Subcontract. As part of the discussions concerning TaSM's

lifting the Stop Work Order, JCBAS demanded that TaSM pay the invoices it had submitted

for the completed milestones; and on October 29, 2014, TaSM made its first and only

payment to JCBAS under the Subcontract in the amount of $5,928,777.  That payment

constituted the same percentage of the Subcontract price (approximately 47%) that the Army

had paid TaSM with respect to the Prime Contract Delivery Order 0001 price (all of which

TaSM had received by September 30), leaving a balance on JCBAS' invoices of $931,474.

62. In November 2014, JCBAS issued to TaSM three invoices for the final deliveries it made

under the Subcontract and DO1.  These invoices were for $931,474 (on November 19, 2014),

$931,474 (on November 21, 2014), and $970,270 (November 24, 2014).  By November 24,

JCBAS had invoiced TaSM a total of $9,693,469, constituting 77% of the value of the

Subcontract for milestone payments with respect to delivery of all 72 two-story KEEP

shelters, $3,764,692 of which remained unpaid.  On January 28, 2015, approximately two

months after TaSM terminated the Subcontract, JCBAS issued to TaSM all remaining

invoices contemplated by the Subcontract and DO1, which totaled $2,834,531, bringing the

total amount of its outstanding invoices to $6,599,223.

63. By February 25, 2015, the Army had paid TaSM a total of $11,513,775, approximately 77%

of the Prime Contract, constituting the specified milestone payments through the delivery of

all 72 two-story KEEP shelters under Prime Contract Delivery Order 0001.

64. Despite receiving additional milestone payments from the Army, TaSM refused to pay any

portion of JCBAS' outstanding invoices totaling $6,599,223.

### TaSM's Prospects for Additional Work from the Army

65. The Army issued a total of six firm-fixed-price delivery orders to TaSM under the Prime

Contract with a total contract price of $18,404,304.  By October 10, 2016, the Army had paid

TaSM approximately $16,643,901 of that amount for its work under the Prime Contract.

21

66. Although the Army's orders under the Prime Contract had a contract price less than the permitted "ceiling," the Army did not issue additional delivery orders to TaSM under the Prime Contract because the Army had decided that it did not need any more KEEP shelters.

67. In 2015, the Army discussed with TaSM the potential of a "Combined Aid Station" that would serve as a dental clinic at Camp Beuhring, Kuwait.  While the discussions included the exchange of a statement of work and rough design for the potential structure, the project never got beyond some conceptual discussion because the Army had neither the money nor a contract to pursue the project.  As a result, the Army's preliminary interest never materialized, and the project just fell to the wayside.  Johnson was unaware of the Combined Aid Station project.

68. Johnson did not preclude any economic opportunities that TaSM had with the Army related to KEEP; and neither Johnson's actions nor TaSM's performance with respect to the two-story KEEP shelters influenced the Army's decision not to order more KEEP shelters or the Combined Aid Station from TaSM.

**Contractual Damages**

TaSM claims damages in the total amount of $7,241,026 as a result of JCBAS' breaches of the Subcontract and its warranties.[11]  That claim consists of the following with respect to the first 36 two-story KEEP shelters:[12]

---

[11] Because the Court finds and concludes that TaSM is not entitled to recover for its "cover" with respect to the second 36 two-story KEEP shelters, it makes no findings as to TaSM's approximately $3 million in claimed damages based on its purported re-procurement costs.

[12] In their proposed findings of fact and conclusions of law, the parties have essentially split the relevant performance of the Subcontract into two categories: the shipping of the materials for the "first" 36 two-story KEEP shelters and training that occurred before the Stop Work Order on September 10, 2014; and the shipping of the materials for the "second" 36 two-story KEEP shelters, which occurred between TaSM's lifting of the Stop Work Order in October 2014 and TaSM's termination of the Subcontract on December 3, 2014.  While the shipments that occurred before the Stop Work Order contained more than the materials  needed for the first 36 two-story KEEP

a.  $3,461,481, consisting of $486,298 for the period before TaSM's termination of the Subcontract on December 3, 2014 and $2,975,183 for the period after that termination. These post-termination damages include approximately $1,329,239 in damages for the period before the Army's acceptance of those shelters in June 2015, and the balance of approximately $1,645,944 for the period after the Army's acceptance.

b.  $100,000, which TaSM claims it incurred in November and December 2016 (without any pre-trial disclosure of that amount) to fix the leaking roofs on the KEEP buildings assembled with materials supplied by JCBAS.

69. TaSM's costs claimed as damages with respect to the first 36 two-story KEEP shelters are not the costs it incurred because of any defects in JCBAS' Subcontract performance.

70. TaSM's claimed damages include costs that TaSM would have incurred even in the absence of any nonconforming performance on JCBAS' part.[13]   By way of example:

a.  TaSM's costs claimed as damages in the category of "materials, tools, and equipment" include all tools and equipment it purchased or rented in connection with the Prime Contract Delivery Order 0001, many of which on their face are unconnected to any nonperformance by JCBAS.  For example, the costs in August and September 2014 include $15,400 for a "portable generator"[14] and hundreds of dollars in generator fuel and extension cords, all of which would go to providing power to Pad 9, nothing JCBAS did;

shelters, and the shipments between October and December 2014 therefore contained less than all the materials needed for the remaining 36 two-story KEEP shelters, the Court has adopted  the parties' approach.

[13] In support of its damages claim, TaSM introduced expert testimony and supporting accounting evidence. Presently pending is Defendants' Motion to Strike Portions of Plaintiff's Damages Expert Testimony and to Exclude Plaintiff's Summary Accounting Reports [Doc. No. 187].  As evidenced by the Court's findings, Defendants have raised substantial objections to the admissibility of that expert and accounting evidence.  The Court concludes, however, that for the purposes of this bench trial, Defendants' objections go to the weight to be given that evidence rather than establishing its inadmissibility under *Daubert* or any of the other grounds that Defendants have relied on; and Defendants' Motion to Strike is therefore denied.

[14] Like certain other purchases that TaSM has claimed as damages, this piece of equipment has a residual value that extends beyond contract performance, but there is no off-setting credit.

and "safety glasses," a "wet/dry vacuum," "leather palm gloves," "hand soap," a "first aid kit," "headlamps," and "OSHA Safety 30 Hour Training," although JCBAS was at most obligated to provide tools required for assembly, not any and every item used in connection with assembly.  TaSM also claims hundreds of thousands of dollars in equipment rentals without any description beyond "rental of material handling eq[uipment]," "equipment rental," or the like.  Those few rental charges with more detailed descriptions indicate that equipment rented included forklifts, which TaSM acknowledged were its responsibility.[15]  One of the more obvious misplaced costs claimed as damages in this category is more than $100,000 for materials purchased in March-April 2015 from Evia Operations S.a.R.L.—one of  the subcontractors TaSM used for its *single*-story KEEP shelters and to obtain materials as part of its "cover" for the *second* 36 two-story KEEP shelters.  Similarly, claimed as damages are materials described as being for Pad 8 and Pad 9, although Pad 8 is the location of the *single*-story KEEP shelters, with which JCBAS had no involvement.

b.  TaSM's pre-termination labor and travel costs claimed as damages include direct labor charges for Donnie Monroe, a TaSM supervisor assigned to KEEP from the outset, as early as June 2014, before any assembly problems would have materialized, and travel expenses for Mr. Munro as early as March 2014, before JCBAS or TaSM had even executed DO1, and in August 2014, a period when Mr. Munro traveled to Kuwait to participate in the contractually required training from JCBAS in Kuwait.  TaSM also

---

[15] JCBAS was only obligated to provide the tools required to assemble the shelters, not, as TaSM recognized in April 2014, "material handling equipment."  Indeed, TaSM contended that JCBAS' failure to palletize the materials increased TaSM's difficulty in moving the materials because they could not be easily lifted with a forklift.  Thus, TaSM would have needed to obtain at least some heavy equipment like forklifts in any event.  Even assuming JCBAS' nonconforming performance caused TaSM to rent *some* heavy equipment, the Court is unable to identify that equipment and its cost.

includes in its claimed pre-termination damages direct labor costs for additional

personnel.  But under the Subcontract, TaSM was required to have multiple supervisors

onsite in Kuwait through December 2014; and TaSM has not shown that it incurred any

expense with respect to additional personnel as a result of JCBAS' nonconforming

performance.  In that regard, TaSM has not identified those individuals who occupied the

various supervisor roles delineated in the Subcontract or explained with sufficient detail

why other individuals were brought onto the project over-and-above those contemplated

positions.

c.   As TaSM confirmed at trial, TaSM has claimed as damages all of the labor and travel

costs it incurred after December 2014, the scheduled completion date.[16]  But a wide range

of events and decisions in this first-of-its-kind project in a challenging environment

impacted the project's schedule and costs.  Those cost-impacting events and decisions

included, without limitation, TaSM's Stop Work Order, Ramadan, the lack of necessary

power and communication lines (attributable to the Army), TaSM's own inefficiencies

and learning curve, the skill levels of  TaSM's onsite work force, TaSM's decision to

forego JCBAS' onsite assistance after October 2014, and TaSM's own project

management, such as the allocation of its own work force between the first 36 two-story

KEEP shelters, the second 36 two-story KEEP shelters, and the one-story KEEP shelters

that TaSM was providing through IQ, LLC, not JCBAS.  As an example of the cost-

allocation issues raised by TaSM's claimed damages, TaSM allocated all of Eddie

---

[16] Because completion of the Subcontract was initially scheduled for December 2014, TaSM established "cure codes" around January 2015 and allocated to those codes the costs it incurred thereafter in its performance under Prime Contract Delivery Order 0001.  Again, TaSM makes no attempt to meaningfully connect the costs that were allocated to those cure codes to JCBAS' nonconforming performance with respect to the first 36 two-story KEEP shelters; and the Court, based on its assessment of the evidence, cannot determine without speculating how much of that total cost was in fact caused by JCBAS' nonconforming performance.

Perez's time from January to June 2015 to the first 36 two-story KEEP shelters, when the evidence shows that he was also involved with work pertaining to the second 36 two-story KEEP shelters during that same period.

d. TaSM's post-termination costs claimed as damages include the amount of approximately $1,645,944 for the period after the Army's acceptance in June 2015.[17] But the Army's acceptance of the first 36 two-story KEEP shelters in June 2015 relieved JCBAS of responsibility for the shelters, except under applicable warranties. TaSM notified JCBAS about JCBAS' liability for only one potential warranty issue with respect to those completed shelters, a resealing issue.[18] However, TaSM has not identified what portion of the more than $1.6 million in damages claimed for this period were for this resealing issue. Similarly, TaSM failed to disclose as required (or sufficiently document) the additional cost of $100,000 purportedly incurred around November and December 2016 in connection with this resealing issue.

71. Overall, TaSM did not identify the costs that it incurred performing under the Subcontract other than those that it attributes to JCBAS' deficiencies. Nor has TaSM identified its total actual costs in assembling the first 36 two-story KEEP shelters, as compared to what it should have cost without any of the alleged defects in JCBAS' performance.[19] Likewise,

---

[17] These damages consist of expenses in fixing the first six KEEP buildings and include $410,828 in labor costs, $509,701 in per diem and travel costs, $343,406 in third-party labor costs, and $382,008 in material, tool, and equipment costs.

[18] The issue pertaining to VentureClad tape used to seal the two-story KEEP shelters had arisen previously, pre-acceptance and pre-termination, although it had not yet been fully remedied. TaSM did not raise the post-acceptance tape failure until November 2015, six months after the buildings were accepted in June 2015. Ultimately, the two-story KEEP shelters were resealed by covering the joints with fiberglass material, then mule-hide tape, and painting a rubber coating material over them.

[19] The evidence that closest approximates a total actual cost for a given period that the Court was able to identify is the sum of $491,388 that TaSM determined on December 4, 2014 it had incurred in assembling the first 36 two-story KEEP shelters. But TaSM claims that it sustained damages for the period before it terminated the Subcontract on December 3, 2014 in the substantially equivalent amount of $486,298. The Court recognizes that TaSM's pre-

TaSM has not identified its total actual costs to perform any particular task actually affected by JCBAS' nonperformance, as compared to what it should have cost to perform that impacted task.

72. In addition to not identifying its actual costs and its "should-have" costs[20] with respect to any particular task that was impacted by JCBAS' nonperformance, TaSM has not provided any other evidence from which any reasonable estimate can be made of what additional costs TaSM incurred as a result of any nonperformance on the part of JCBAS. The net result is the Court's inability to determine based on credible, reliable evidence what portion, if any, of TaSM's costs claimed as damages were, in fact, incurred as a result of any JCBAS nonperformance.[21]

## B.   Conclusions of Law

Based on the findings of fact set forth herein, the Court makes the following conclusions of law:

1. The Court has subject matter and personal jurisdiction to adjudicate this action and the claims and defenses asserted herein.

---

termination damages claim of $486,298 includes overhead, fringe, and G&A charges that may not be included in the amount of $491,388, and that this damages claim excludes at least some labor costs for this period. But these numbers nevertheless reflect so substantial an overlap in costs between the total cost of assembly for the period before termination and the amount TaSM attributes to JCBAS' nonperformance during the same period as to make its pre-termination damages claim suspect on its face. In any event, the claimed damages for the pre-termination period include costs not attributable to any JCBAS nonperformance, and the evidence does not allow the Court to determine the extent to which the claimed damages are, in fact, attributable to JCBAS' nonperformance.

[20] The difference between the Prime Contract price and the Subcontract price does not provide the basis upon which to determine what it should have cost TaSM to complete the first 36 two-story KEEP shelters absent any JCBAS' nonperformance, particularly given TaSM's failure to account for the wide-ranging impacts on the project from various sources, including those noted above.

[21] TaSM also asserts that JCBAS breached the Subcontract by contacting the Army about Subcontract terms and conditions without TaSM's permission. While JCBAS did contact the Army without TaSM's permission, TaSM has failed to claim or prove any contractual damages as a result of those communications.

2.  Virginia law governs the Subcontract and applies to this dispute.  *See* Subcontract, ¶ 21.

Virginia's Uniform Commercial Code (the "Virginia U.C.C."), Va. Code Ann. §§ 8.2-101 *et seq.*, governs the contract claims in this dispute because the Subcontract concerned the sale of goods as defined in the statute.  *See id.* § 8.2-105(1).

### TaSM's and JCBAS' Contract-Based Claims

TaSM claims that JCBAS breached the Subcontract and its warranties.  JCBAS disputes that it breached the Subcontract or any express or implied warranties; and contends that in any event, TaSM cannot recover on its breach of contract and breach of warranty claims because (1) TaSM improperly terminated the Subcontract; (2) TaSM prevented JCBAS from remedying the alleged defects; (3) JCBAS timely delivered the second 36 two-story KEEP shelters; (5) TaSM failed to mitigate its damages; and (5) TaSM did not reasonably quantify its damages.

JCBAS claims that TaSM breached the Subcontract by not paying for the materials it delivered under the Subcontract.  TaSM disputes that it breached the Subcontract and therefore contends that it has no obligation to pay for the remaining materials because (1) TaSM rejected those materials; and (2) as of the time it terminated the Subcontract, JCBAS had materially breached the Subcontract and TaSM terminated the Subcontract because of that prior breach.  TaSM also contends that it only later used certain of those rejected materials as part of its attempt to "cover" for JCBAS' breach by re-procuring the remaining 36 two-story KEEP shelters.

3.  Under Virginia law, the elements of a breach of contract claim are:  "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."

*Navar, Inc. v. Fed. Bus. Council*, 784 S.E. 2d 296, 299 (Va. 2016) (internal quotation marks omitted).

4. With respect to damages "a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted" and also "must prove the amount of those damages by using a proper method and factual foundation for calculating damages." *Id.* (internal quotation marks omitted). While the plaintiff "bears the burden of proving with reasonable certainty the amount of damages," "proof with mathematical precision is not required," although "there must be at least sufficient evidence to permit an intelligent and probable estimate of the amount of damage." *Manchester Oaks Homeowners Ass'n, Inc. v. Batt*, 732 S.E.2d 690, 699 (Va. 2012) (internal quotation marks omitted).

5. Under the Virginia U.C.C., "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest." Va. Code Ann. § 8.2-601. "Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." *Id.* § 8.2-602(1). But "after rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller." *Id.* § 8.2-602(2)(A). In addition, a buyer accepts goods by taking "any act inconsistent with the seller's ownership" of the goods. Va. Code Ann. § 8.2-606(1)(c). As reflected in the Official Comments to this section, "'any action taken by the buyer, which is inconsistent with his claim that he has rejected the goods, constitutes an acceptance.'" *U.S. for Use & Benefit of Whitaker's Inc. of Sumter v. C.B.C. Enterprises, Inc.*, 820 F. Supp. 242, 246-47 (E.D. Va. 1993) (quoting Va. Code. Ann. § 8.2-606, cmt. 4) ("By taking possession of the cabinets, cutting them to fit over pipes and installing the units,

29

[buyer] accepted the cabinets within the meaning of the UCC.  This chain of events

demonstrates activity which was clearly inconsistent with [seller's] ownership of the

cabinets.").  Virginia law further provides that "[a]cceptance of a part of any commercial unit

is acceptance of that entire unit."  Va. Code Ann. § 8.2-606(2).[22]  Moreover, "[t]he buyer

must pay at the contract rate for any goods accepted."  *Id.* § 8.2-607(1).  While "acceptance

does not of itself impair any other remedy . . . for nonconformity," *id.* § 8.2-607(2), "[w]here

a tender has been accepted[,] . . . the buyer must within a reasonable time after he discovers

or should have discovered any breach notify the seller of breach or be barred from any

remedy."  *Id.* § 8.2-607(3).  And the "burden is on the buyer to establish any breach with

respect to the goods accepted."  *Id.* § 8.2-607(4).  Where a buyer has accepted

nonconforming goods and given the seller notice, the buyer "may recover as damages for any

nonconformity of tender the loss resulting in the ordinary course of events from the seller's

breach as determined in any manner which is reasonable."  *Id.* § 8.2-714.

6. "Under Virginia law, 'a party who commits the first material breach of a contract is not

   entitled to enforce the contract,' and the breach excuses the nonbreaching party from future

   performance."  *Bayer Cropscience LP v. Albemarle Corp.*, No. 16-1555, --- Fed. App'x ---,

   2017 WL 2645547, at *4 (4th Cir. June 20, 2017) (brackets omitted) (quoting *Horton v.*

   *Horton*, 487 S.E.2d 200, 203 (Va. 1997)).  But a party may not invite continuing

   performance after accepting defective performance only to later claim that its contractual

---

[22] The Virginia U.C.C. defines "commercial unit" as:

> such a unit of goods as by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use. A commercial unit may be a single article (as a machine) or a set of articles (as a suite of furniture or an assortment of sizes) or a quantity (as a bale, gross, or carload) or any other unit treated in use or in the relevant market as a single whole.

*Id.* § 8.2-105(6).

obligations had actually ended upon this defective performance.  *See id.* (citing *Am. Chlorophyll v. Schertz*, 11 S.E.2d 625, 628 (Va. 1940)).

7. "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract."  *Horton*, 487 S.E.2d at 204.  While determining whether a breach is material is generally fact-specific, *see id.*, "under Virginia law, it is well-settled that failure to make timely payment constitutes a material breach."  *Tandberg, Inc. v. Advanced Media Design, Inc.*, No. 1:09cv863, 2009 WL 4067717, at *4 (E.D. Va. Nov. 23, 2009) (citing cases).

8. JCBAS tendered goods and performance that were nonconforming in certain respects when it delivered certain of the first 36 two-story KEEP shelters.[23]  TaSM accepted those nonconforming goods but timely notified JCBAS of those nonconformities and is therefore entitled to recover damages, upon appropriate proof of damages.  *See id.* § 8.2-714(1) (a buyer is allowed to "recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable").[24]

---

[23] In asserting that JCBAS breached the Subcontract, TaSM relies on a wide range of conduct, some of which it has proven were instances of nonperformance and others it has not.  For example, TaSM asserts that the fire alarm systems JCBAS provided were noncompliant although certain subsequent modifications were upgrades not required by the Subcontract for which the Army compensated TaSM.  In any event, because the Court finds that TaSM has failed to prove its damages as to any particular aspect of JCBAS' alleged nonperformance or its overall performance, the Court need not determine the precise bounds of JCBAS' noncompliant performance.

[24] TaSM had a contractual right to require JCBAS' assistance onsite in Kuwait.  *See* Subcontract § 30 (providing that in the event of JCBAS' nonconforming performance, "[TaSM] may require prompt correction thereof").  This remedy, however, was not TaSM's exclusive remedy; and while TaSM's decision to forego JCBAS' assistance after October 2014 may have affected the amount of damages TaSM would have been entitled to receive because of any nonperformance  by JCBAS, TaSM is not contractually precluded from recovering damages because it prevented JCBAS from remedying any defective performance.  *See* Va. Code Ann. § 8.2-719(1)(b) ("resort to a remedy" provided by contract "is optional unless the remedy is expressly agreed to be exclusive"); *Va. Elec. & Power Co. v. Bransen Energy, Inc.*, 850 F.3d 645, 657 (4th Cir. 2017) ("A contractual remedy is 'exclusive where the language employed in the contract clearly shows an intent that the remedy be exclusive.'") (quoting *Bender–Miller Co. v. Thomwood Farms*, Inc., 179 S.E.2d 636, 638 (Va. 1971)).

9.   TASM failed to prove by a preponderance of the evidence that as a result of any JCBAS' nonperformance it incurred the claimed $486,000 in pre-termination costs or $2.975 million in post-termination costs, or any portion of those claimed damages.  Likewise, it failed to prove by a preponderance of the evidence any damages attributable to warranty claims.  As detailed above, TaSM's evidence, including its expert, cost codes, and accounting evidence, does not provide a credible, reliable basis upon which to make an intelligent, reasonable, or probable estimate concerning those costs and expenses TaSM incurred as a result of any breach of the Subcontract.

10.  JCBAS substantially performed under the Subcontract in response to TaSM's demands for continued performance when, at TaSM's direction, JCBAS shipped all remaining materials due under the Subcontract before TaSM terminated it on December 3, 2014.

11.  Following its termination of the Subcontract, TaSM did not effectively reject the materials for the second 36 two-story KEEP shelters but rather accepted those materials by using them instead of returning them.  Indeed, TaSM invoiced, received, and accepted millions of dollars in payments from the Army for the very materials that it claims it rejected.[25]

12.  Because JCBAS substantially performed with respect to the second 36 two-story KEEP shelters and TaSM accepted that performance, TaSM did not have the right to "cover" under the Virginia U.C.C. with respect to the second 36 two-story KEEP shelters.  *See* Va. Code

---

[25] TaSM claims that under the Subcontract there can be no acceptance on its part of the shipped materials for the second 36 two-story KEEP shelters until the Army accepts the assembled shelters, which had not yet occurred at the time of trial.  Contractual parties may vary the provisions supplied by the Virginia U.C.C., including the acceptance and rejection provisions.  *See Va. Elec. & Power Co. v. Bransen Energy, Inc.*, 3:14-cv-538, 2015 WL 2061983, at *13-14 (E.D. Va. Apr. 30, 2015), *aff'd*, 850 F.3d 645 (4th Cir. 2017).  Here, however, the Subcontract merely specifies that final acceptance of the assembled shelters occurs when the Army accepts the shelters.  It does not purport to alter what may constitute acceptance of JCBAS' shipments of materials under the U.C.C.  In that regard, by acting inconsistently with any purported "rejection" of the materials for the second 36 two-story KEEP shelters, TaSM had effectively accepted those shipments.  In any event, TaSM had the obligation to pay JCBAS for those materials within 5-7 days of its receiving payment from the Army for them and breached that obligation.

Ann. §§ 8.2-601, 8.2-711.  Rather, by failing to effectively reject those two-story KEEP shelters, TaSM was only entitled to recover damages for any nonconformity in performance with respect to those shelters if TaSM gave JCBAS notice of the breach.  *See id.* § 8.2-714.  But TaSM neither gave JCBAS notice of any nonconformity of the second 36 two-story KEEP shelters nor established any such breach by JCBAS with respect to those shelters.

13. TaSM's use of the remaining shipments of JCBAS materials did not constitute mitigation of damages or part of its "cover" with respect the second 36 two-story KEEP shelters, as TaSM contends, but rather acceptance of that shipment.  Indeed, TaSM planned to use major components out of the final 51 containers before those materials even arrived in Kuwait and in fact used them after purporting to reject them.

14. As a result of TaSM's acceptance of the second 36 two-story KEEP shelters, TaSM was obligated to pay for those materials in accordance with the terms of the Subcontract.  TaSM breached the Subcontract by its nonpayment.[26]

15. As a result of TaSM's breach of the Subcontract, JCBAS has been damaged in the amount of $6,599,223, the amount that remains unpaid under the Subcontract and DO1.[27]

---

[26] TaSM appears to argue that under the terms of the Subcontract, it does not have any obligation to pay for goods or services after the date of its Subcontract termination. TaSM's termination, however, had no effect on its obligation to pay for JCBAS' Subcontract performance before the date of its termination.  *See* Subcontract § 30(c) (providing that termination only limits TaSM's liability "to payment under the payment provisions hereof for all work and services performed by [JCBAS] in accordance herewith *before the date of termination*.") (emphasis added).

[27] Based on the evidence at trial, TaSM has not yet received final payment with respect to the second set of two-story KEEP shelters because the Army has not yet finally accepted those shelters.  Under the terms of the Subcontract, JCBAS is not entitled to its final payment of approximately $1,420,675 until TaSM receives its payment upon final acceptance by the Army.  Nevertheless, and even though TaSM has not raised as a defense this "pay-when-paid" provision at trial or in post-trial briefing, the Court has considered that issue in connection with its calculation of JCBAS' breach of contract damages and concludes that because TaSM is deemed to have accepted all of JCBAS' shipments and materially breached its obligation under the Subcontract to pay for those shipments, based on the payments it has received from the Army, TaSM may not rely on this "pay-when-paid" provision to reduce JCBAS' damages.  *See Fed. Ins. Co. v. Starr Elec. Co.*, 410 S.E.2d 684, 689 (Va. 1991).  JCBAS is therefore entitled to recover as damages the balance of its outstanding invoices.

33

16. JCBAS' nonconforming performance did not constitute a material breach.  The early defects in JCBAS' performance did not defeat the essential purpose of the Subcontract.  Indeed, TaSM billed the Army for those materials, received payment from the Army for those materials, and used those materials to assemble the first 36 two-story KEEP shelters, which the Army accepted and paid for without reservation.

17. TaSM's improper withholding of payments through October 29, 2014, after it had received corresponding payments from the Army on September 9-10, 2014, was the first material breach under the Subcontract.  Thereafter, JCBAS elected to continue performance and did so without a material breach.  TaSM then materially breached the Subcontract again by refusing to make timely payments, as required under the Subcontract.

18. Even assuming, *arguendo*, JCBAS had first materially breached the Subcontract, JCBAS would not be precluded from recovering the balance of the Subcontract price under the first material breach doctrine because TaSM accepted the first 36 two-story KEEP shelters and demanded continued performance, which JCBAS provided without a material breach.  *See Bayer Cropscience LP*, 2017 WL 2645547, at *4–5.

19. With respect to the implied covenant of good faith and fair dealing, "the failure to act in good faith under [the Virginia U.C.C.] does not amount to an independent tort.  The breach of the implied duty under the U.C.C. gives rise only to a cause of action for breach of contract." *Charles E. Brauer Co. v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 385 (Va. 1996).  JCBAS has recovered all that it can under the Subcontract, *see* Subcontract §§ 10, 38(c); and is not entitled to recover further based on its claimed breach of the implied covenant of good faith and fair dealing.

34

**TaSM's Tortious Interference Claim Against Defendants**

TaSM claims that Defendants tortiously interfered with its business expectancy that it would receive approximately $11 million in additional delivery orders under its Prime Contract and also an additional $2,446,101 for a Combined Aid Station to serve as a dental clinic. Although the Army ultimately did not issue work orders or contracts to anyone in either category of anticipated work, TaSM claims that Army did not issue such work orders or contracts because of Defendants' "improper means, including, but not limited to, disparaging TaSM to the Army and perpetuating a fraudulent scheme to substitute Styropor for Neopor."

20. To prevail on a claim for tortious interference with business expectancy, TaSM must show: (1) "the existence of a business relationship or expectancy, with a probability of future economic benefit"; (2) the defendant's "knowledge of the relationship or expectancy"; (3) "that it was reasonably certain that absent intentional misconduct, the claimant would have continued the relationship or realized the expectancy"; (4) that the defendant "employed improper means"; and (5) that the plaintiff "suffered damages from the interference." *Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001). "[P]roof of the existence of the first and third elements of the tort must meet an objective test; proof of subjective expectations will not suffice." *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 897 (Va. 1997) (mere "possibility" of a future benefit is insufficient); *see also Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 321 (4th Cir. 2012) (tortious interference "is not casually triggered").

21. TaSM failed to prove by a preponderance of the evidence that the Army ever planned with the requisite certainty—that is, an objective probability rather than a mere possibility—to order additional KEEP shelters or to award a contract to TaSM for the Combined Aid

Station.  For this reason, TaSM has failed to adequately prove that it was "reasonably

certain" to have realized such work absent any asserted misconduct by Defendants or that the

Defendants' actions caused TaSM not to receive work from the Army that was otherwise

reasonably certain.  TaSM has also not proven that Defendants had any knowledge of the

Combined Aid Station project.

22. For these reasons, TaSM is not entitled to recovery on its tortious interference claim.

### TaSM's Fraud Claim Against Defendants

TaSM claims that Defendants fraudulently induced it to enter the Subcontract and DO1

by knowingly misrepresenting their intent to use Styropor, as opposed to Neopor, in the panels

for the two-story KEEP shelters.  TaSM contends that this misrepresentation caused it to sustain

damages in the amount of  (1) $22,423.04, the cost of training that TaSM provided to the Army

at no cost, claiming that this training was provided in exchange "for a delivery extension that

was caused by, among other things, the interruption associated with the Styropor/Neopor

substitution," and (3) $31,050, which TaSM claims is the difference in market value between

shelters with Neopor throughout and shelters with Neopor only in the exterior panels.

23. Under Virginia law, in order to prove fraudulent inducement of a contract, TaSM must prove

by clear and convincing evidence: "(1) a false representation, (2) of a material fact, (3) made

intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and

(6) resulting damage to the party misled."  *Evaluation Research Corp. v. Alequin*, 439 S.E.2d

387, 390 (Va. 1994).  But misrepresentations that "relate[] to a duty or an obligation that was

specifically required" by a contract  "do not give rise to a cause of action for actual fraud."

*Richmond Metro. Auth. v McDevitt Street Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998); *see

Dunn Const. Co. v. Cloney*, 682 S.E.2d 943, 946-47 (Va. 2009) (explaining that a duty based

in contract cannot form the basis for a tort, including fraud).  For this reason, a false representation about the performance of a contractual duty cannot form the basis of a fraud claim, whereas a false representation that precedes, and induces the creation of, a contract can, since it violates a duty that exists independent of the yet-to-be-formed contract.  *See, e.g.*, *Abi-Najm v. Concord Condo., LLC*, 699 S.E.2d 483, 490 (Va. 2010).  And a "promisor's state of mind at the time he makes the promise is a fact," and thus a pre-contract misrepresentation about performance of an obligation "with a present intention not to perform" can form the basis of a fraudulent inducement claim.  *Id.* (internal quotation marks omitted).

24. TaSM has failed to prove by clear and convincing evidence, or even a preponderance of the evidence, that JCBAS knowingly made material misrepresentations with the intent to induce TaSM to enter into the Subcontract or DO1.[28]

25. TaSM has also failed to prove that it suffered any damage as a result of the alleged fraud.  First, the Army accepted the substitution of Styropor for Neopor in the interior walls of the two-story KEEP shelters on July 28, 2014 and by the Army's own account, did not require "compensation or anything else" for approval of the substitution.  Simmons Dep. 131:4-6.

---

[28] TaSM also failed to prove by clear and convincing evidence that JCBAS was consciously aware of, as opposed to overlooking through inadvertence, negligence, or mistake, the discrepancy between its pricing with Premium Steel and its proposal to TaSM before the execution of the Subcontract.  The overall cost difference to JCBAS by using Neopor rather than Styropor in all the exterior panels was only $31,050; the additional cost to JCBAS to use Neopor throughout (*viz.*, in the interior panels as well) would not have added significantly to that cost involved in this $12,528,000 Subcontract; and it is unlikely that JCBAS waited until after the Subcontract was executed to request a substitution to save such a small amount.  Moreover, nothing in the Subcontract itself specifically required that Neopor be used; and it was not until DO1 was executed by TaSM on May 23, 2014 that using Neopor became a contractual requirement through DO1's incorporation of the SOW, which incorporated the Technical Proposal that specified the use of Neopor in the panels of the two-story KEEP shelters.  Beginning around May 14, 2013, at least one TaSM employee was onsite at the ATEC assembly and observed that the panels contained both gray (Neopor) and white (Styropor) insulating materials.  JCBAS made no attempt to conceal from TaSM during the manufacturing or assembly process its conspicuous use of Styropor in the interior wall panels.  Finally, the Court also finds that TaSM failed to prove by clear and convincing evidence that, given all the facts and circumstances, the use of Neopor, rather than Styropor, in the interior panels was material to TaSM's decision to enter the Subcontract or DO1.  *See Packard Norfolk, Inc. v. Miller*, 95 S.E.2d 207, 211-12 (Va. 1956) ("[A] fact is material when it influences a person to enter into a contract, when it deceives him and induces him to act, or when without it the transaction would not have occurred.").

The Army approved Styropor in the interior walls, in part, so that the project "could stay on schedule." *Id.* at 128:19. The relied-upon Prime Contract modification, which required TaSM to provide uncompensated training, was executed on May 8, 2015, more than nine months after the Army accepted the substitution without any price concessions, and is described by the Army as compensation required "to change the delivery schedule on SLINs 0002AA, 0002AB, and 0002AC." Def. Ex. 19. The substitution of Styropor in the interior walls was not the cause of a delivery delay nine months later, long after JCBAS had been terminated, particularly considering that replacing Styropor for Neopor mitigated, not caused, delay. Second, TaSM failed to establish that the amount of $31,050 constitutes any cognizable damage. That figure was the cost difference *to JCBAS* to use Neopor instead of Styropor in all *exterior* panels; and in any event, there is no evidence that this cost difference has any relationship to a difference in the overall value of the shelters to TaSM, as the Army in fact paid TaSM for the shelters without any reduction because of the use of Styropor.

26. For the above reasons, TaSM is not entitled to recovery on its fraud claim.

27. As to JCBAS' claim for prejudgment interest, under Virginia law, which governs prejudgment interest in this diversity case, *see, e.g.*, *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999), the trial court "may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." Va. Code Ann. § 8.01–382. Whether and for what period to grant such an award are decisions committed to the trial court's discretion. *See, e.g.*, *Hitachi Credit Am. Corp.*, 166 F.3d at 633; *Dairyland Ins. Co. v. Douthat*, 449 S.E.2d 799, 801 (Va. 1994). A court's discretion is guided by balancing the equities of each case—in particular, the desire to make the prevailing party whole, including compensation for its lost ability to use the money to

38

which it was rightfully entitled, with the losing party's right to litigate a bona fide legal

dispute. *Wells Fargo Equip. Fin., Inc. v. State Farm Fire & Cas. Co.*, 823 F. Supp. 2d 364,

366 (E.D. Va. 2011). And "[g]enerally, prejudgment interest is not allowed on unliquidated

damages in dispute between the parties." *Advanced Marine Enters. v. PRC Inc.*, 501 S.E.2d

148, 160 (Va. 1998).

28. Under all the facts and circumstances pertaining to the parties' claims and the unresolved

legal and factual issues that existed with respect to those claims, JCBAS' claim was subject

to a substantial and bona fide dispute and was unliquidated. Therefore, the Court concludes

that JCBAS was not entitled to prejudgment interest with respect to its awarded damages.

**CONCLUSION**

For the above reasons, TaSM is not entitled to recover any damages for (1) breach of the

Subcontract; (2) breach of warranty; (3) fraud; or (4) tortious interference with business

expectancy. JCBAS is entitled to recover damages for breach of the Subcontract in the amount

of $6,599,223. The Court will accordingly enter judgment in favor of JCBAS and against TaSM

on Counts I-II of the Complaint; in favor of JCBAS, JCFS, and JCI and against TaSM on Counts

III and V of the Complaint; in favor of JCBAS and against TaSM in the amount of $6,599,223

on Count I of the Counterclaim; and in favor of TaSM and against JCBAS on Count II of the

Counterclaim. Accordingly, it is hereby

ORDERED that judgment be ENTERED as follows:

1. in favor of Defendant Johnson Controls Building Automation Systems, LLC and

against Plaintiff Technology and Supply Management, LLC on Counts I-II of the

Complaint;

2. in favor of Defendants Johnson Controls Building Automation Systems, LLC, Johnson

Controls Federal Systems, Inc., and Johnson Controls, Inc. and against Plaintiff

Technology and Supply Management, LLC on Counts III and V of the Complaint;

3. in favor of Counterclaimant Johnson Controls Building Automation Systems, LLC and

against Counterclaim-Defendant Technology and Supply Management, LLC in the

amount of $6,599,223 on Count I of the Counterclaim; and

4. in favor of Counterclaim-Defendant Technology and Supply Management, LLC and

against Counterclaimant Johnson Controls Building Automation Systems, LLC on Count

II of the Counterclaim.

The Clerk is directed to forward a copy of this Memorandum of Decision and Order to all

counsel of record and enter judgment pursuant to Federal Rule of Civil Procedure 58 in

accordance with this Memorandum of Decision and Order.

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
July 28, 2017

APPENDIX A

The Subcontract (including those documents it incorporates) contains the following relevant provisions:

Subcontract § 1 – "General Obligations" provides:

[JCBAS] agrees, subject to the terms and conditions hereof, to perform the work and services set forth or otherwise referenced in Section 2 pursuant to one or more Delivery Orders or Task Orders ("Order"' or "Orders") issued by [TaSM] hereunder from time to time.

[JCBAS] shall comply with all terms and conditions provided by [TaSM].  Unless necessary to the execution of Orders, [JCBAS] will not take any action or omit to take any action within the scope of [JCBAS'] work hereunder that will, or would reasonably be expected to, prevent or hinder [TaSM] from complying with any provision of the prime contract.

Subcontract § 2 – "Statement of Work" provides:  "[JCBAS] shall provide the work and services set forth in each Order.  All work and services performed under this Subcontract shall be in accordance with the respective Orders issued and the applicable sections of the Scope of Work (Attachment 1)."

Subcontract § 10 – "Insurance, Indemnification and Liability" provides in relevant part:

Notwithstanding anything herein to the contrary, in no event shall [TaSM's] liability for any breach or alleged breach of any Order under this Subcontract exceed the total amount earned by and properly payable to Subcontractor under such Order; Neither Party shall be liable to the other Party hereunder for any special, incidental, consequential or punitive damages resulting from any such breach or alleged breach of this Subcontract.

Subcontract § 13 – "Payment, Invoice due Dates, and Format" provides in relevant part:

a. . . . . Milestone payments, if modified into [TaSM]'s contract with the Government, will be flowed down to [JCBAS]

*    *    *    *    *

d. [TaSM] will pay [JCBAS'] acceptable invoice in accordance with this Subcontract on a pay-when-paid basis.  [TaSM] shall remit payment electronically within 5 days of payment from the United States Government for the services covered herein.  If [JCBAS] is paid any amount by [TaSM] hereunder that is disallowed by the Government, [JCBAS] shall promptly credit or refund such disallowed amount to [TaSM upon receiving a copy of such disallowance notice provided to [TaSM] by the Government.

Subcontract § 18 – "Warranty" provides in relevant part:

Subcontractor represents and warrants (1) that the price charged for the goods and/or services purchased pursuant hereto shall be no higher than Subcontractor's current price to any other customer for the same quality and quantity of such goods or services; (2) that all goods and

services delivered pursuant hereto will be new, unless otherwise specified, and free from defects in material and workmanship; (3) that all goods and services will conform to applicable specification, drawings, and standards of quality and performance, and that will be free from defects in design and suitable for their intended purpose; (4) that the goods covered by this order are fit for consumer use, if so intended; (5) that all warranties made by seller, collectively and individually, shall not be voided under any circumstances and should the goods delivered become damaged for any reason that Subcontractor shall pay all costs for repair of the goods regardless of how the damage occurred; (6) that Subcontractor shall perform all warranty service and that the goods delivered shall be covered by the Subcontractors warranty as follows:

[chart detailing specific warranties for certain shelter components]

SELLER HEREBY EXPRESSLY WARRANTS THAT ALL GOODS DELIVERED TO BUYER UNDER THIS AGREEMENT OR UNDER ANY ORDER SHALL BE FREE FROM ALL DEFECTS. SELLER EXPRESSLY WARRANTS THAT ALL GOODS DELIVERED HAVE BEEN DESIGNED AND SHALL BE ABLE TO WITHSTAND AT LEAST FOR THE MINIMUM DURATION OF THE TIME STATED ABOVE FOR EACH PART ANYWHERE IN THE WORLD.  SELLER AGREES THAT ANY ITEM THAT IS DAMAGED AT ANY TIME, INCLUDING, BUT NOT LIMITED TO DURING THE SETUP, TAKEDOWN, OR RESET OF ANY BUILDING, SYSTEM OR COMPONENT THEREOF FOR THE DURATION SPECIFIED ABOVE FROM THE ACCEPTANCE OF THE GOOD BY THE BUYER AND THE U.S. GOVERNMENT, SHALL BE REPLACED AT THE SOLE EXPENSE OF SELLER WITHOUT ANY RIGHT OF REPAYMENT, SETOFF OR COVER FROM BUYER.  SELLER AGREES TO INDEMNIFY BUYER AGAINST ANY AND ALL WARRANTY OR PRODUCT CLAIMS, EXCEPT TO THE EXTENT THAT ANY CLAIM IS DUE SOLELY TO THE FAULT OF BUYER.  SELLER AGREES TO INDEMNIFY BUYER AGAINST ALL WARRANTY CLAIMS MADE BY THE GOVERNMENT.  IF BUYER IS REQUIRED BY THE GOVERNMENT TO EXPEND ANY FUNDS OR PERFORM ANY WORK TO REPAIR OR REPLACE ANY ITEM WARRANTED BY SELLER, SELLER AGREES TO REPAY BUYER FOR ALL SUCH WORK AND THE COSTS ASSOCIATED THEREWITH.

All representations and warranties of Subcontractor together with its service warranties and guarantees, if any, shall run to Buyer and Buyer's customers.  The foregoing warranties shall survive delivery, inspection, acceptance, or payment by the Buyer and shall survive the termination of this agreement for any purpose.

Subcontract § 21 – "Governing Law and Disputes" provides in relevant part:  "This contract shall be governed by the laws of the Commonwealth of Virginia without respect to its conflicts of law's [sic] provisions."

Subcontract § 30 – "Inspection/Acceptance" provides:

All inspections of goods, materials, supplies, and services are subject to the FAR Clause 52.246-2, whether during or after manufacture of the goods or materials, or performance of

the services, and notwithstanding the terms of delivery or payment, as to goods, that title has not yet passed to [TaSM] or [TaSM's customers]. Inspection may take place at any time and at any location including on-site inspections at [JCBAS] facilities. Acceptance of the engineering and specifications of the building design shall take place at Radford, Virginia after ATEC Certification; however, acceptance of each individual building and its components shall take place after full construction on site in Kuwait. In the event that goods supplied, or services performed, are not supplied or performed in accordance with the specifications and instructions of [TaSM] and [TaSM's customer], [TaSM] may require prompt correction thereof, and, as to services, require that the services be rendered again at [JCBAS'] expense. If any defects exist and [JCBAS] is unable or refuses to replace the good or render the services again promptly, [TaSM] may terminate this subcontract for default.

Subcontract § 38 – "Termination" provides in relevant part:

b. In addition, [TaSM] shall be entitled to terminate this Subcontract for default or breach by [JCBAS] if [JCBAS] fails to remedy such conditions within seven (7) days from the date of receipt of notice from [TaSM] concerning the existence of the condition. If any termination of this Subcontract made in good faith for default or breach by [JCBAS] is subsequently determined to have been without legal justification, the rights and obligations of the Parties shall be the same as if the Subcontract (or the Order in question) had been rightfully, and with legal justification, terminated for default or breach.

c. If this Subcontract is terminated by [TaSM], with or without reason, [TaSM]'s liability shall be limited to payment under the payment provisions hereof for all work and services performed by [JCBAS] in accordance herewith before the date of termination.

Subcontract § 41 – "Survival" provides: "The following provisions of this contract shall survive the termination of this contract: 10, 13, 16, 17, 19, 20, 21, 22, 23, 25, 26, 28, 29, 30, 32, 34-38, and 41."

DO1 ¶ 5 – "Payment Terms" provides:

[TaSM] will pay [JCBAS] on a pay when paid basis after Government acceptance for all items delivered under this Delivery Order in accordance with Attachment 2- Milestone Schedule for [JCBAS'] portion of the work complete. After [TaSM] receives payment based on Attachment 2-Milestone Schedule,[29] [JCBAS] will be paid with 5-7 business days accordingly.

---

[29] Attachment 2 contains the following invoicing schedule (format: JCBAS invoice date (% to be billed)): 5/21/2014 (3.78%); 5/28/2014 (6.37%); 6/4/2014 (7.44%); 6/12/2014 (7.44%); 6/20/2014 (7.44%); 6/28/2014 (7.44%); 7/6/2014 (7.44%); 7/16/2014 (7.44%); 7/21/2014 (7.44%); 7/30/2014 (7.44%); 8/13/2014 (7.74%); 8/30/2014 (1.89%); 8/30/2014 (1.89%); 9/18/2014 (1.89%); 9/19/2014 (1.89%); 10/11/2014 (1.89%); 10/12/2014 (1.89%); 10/31/2014 (1.89%); 11/1/2014 (1.89%); 11/19/2014 (1.89%); 11/20/2014 (1.89%); 12/7/2014 (1.89%); 12/10/2014 (1.89%).

DO1 ¶ 6 – "Invoices" provides that JCBAS "shall submit invoices per Attachment 2-Milestone Schedule once acceptance of those Deliverables has been provided by the Government to [TaSM]."

DO1 ¶ 7 – "Period of Performance" provides that "[t]he period of performance is 11 February 2014 – 31 December 2014."

DO1 ¶ 8 – "Place of Performance" provides that JCBAS shall perform in the following locations: Radford, VA; Dublin, VA; and Camp Beuhring, Kuwait.

DO1 ¶ 9 – "Delivery Terms" provides for F.O.B. Origin

DO1 ¶ 10 – "Delivery Schedule" provides for a delivery schedule, set forth in "Attachment 3-Delivery Schedule."[30]

DO1 ¶ 11 – "Acceptance Criteria" provides:

> All contract deliverables including (but not necessarily limited to) monthly status reports and all Energy Efficient Units submitted to [TaSM] shall be deemed accepted upon Government acceptance of the Energy Efficient Units at Camp Beuhring, Kuwait.

SOW ¶ 2.1 – "Detailed Requirements – Design Review" provides in relevant part:

> [JCBAS] shall cover all the required tools during the design review that will be necessary to erect the shelters, and the design of how the shelters will be packaged into containers. [TaSM] is interested in innovative packaging to see if less containers can be utilize during the transportation. Packaging of the shelters shall be completed in the most effective way to be ready for shipping but no greater that two containers per two story shelter.

SOW ¶ 2.2 – "Detailed Requirements – Production of 72 two-story Shelters" provides:

> TaSM shall provide all 40' containers at Dublin, Virginia for [JCBAS]. [JCBAS] shall fully package all 72 two-story shelters including tools that will be required to assemble the shelters into the 40' containers. Fully packaged containers shall be made ready for shipment and will be picked up by TaSM according to the schedule provided to the Subcontractor. Any changes to the schedule shall be approved by TaSM. The shelters must include all the items required for the complete installation (electrical, ECU, etc.) as listed in the proposal.

SOW ¶ 2.2.1 – "Detailed Requirements – Shelter Requirements" provides:

> [JCBAS] is responsible for the provision of all components of the shelters, including every part necessary for final and complete assembly. All components, including the shelter as a whole, shall be in conformance with the PWS and the Proposal Documents.

---

[30] Attachment 3 is blank.

SOW ¶ 2.2.3 – "Detailed Requirements – U.S. Army Test and Evaluation Command (ATEC) Certification" provides:

> [JCBAS] shall produce and assemble three units for ATEC certification. All three units shall pass all test objectives. All three units shall be undamaged, complete and ready for operation before testing. This certification is to be completed at Dublin, Virginia.

> One month prior to the ATEC inspection, [JCBAS] shall provide to [TaSM] a draft of the shelter guide and all Material Safety Data Sheets (MSDS).

> After the initial inspection, [JCBAS] shall make all corrections to any test incidents in order to receive ATEC certification.

> After certification, the units shall remain at Dublin, Virginia for training and other purposes 4-6 weeks after ATEC certification. If the units are no longer required for training, the units shall be disassembled, packaged and loaded, ready for shipment to Kuwait.

SOW ¶ 2.2.5 – "Detailed Requirements – Packaging" provides:

> [JCBAS] shall package by design each two story shelter into two 40' shipping containers (ISO containers) in accordance with the PWS and the Proposal Documents.  Packaging of the shelters shall be completed in the most effective way to be ready for shipping but no greater that two containers per two story shelter.  [JCBAS] shall also include in the shipping container for each individual shelter a shelter guide as described in section 3.4 below.  All components of the shelter, to include all hardware and accessories required for full operation of the shelters shall be packaged in their final form, ready for final assembly.

SOW ¶ 2.4 – "Detailed Requirements – Training support" provides:

> [JCBAS] shall provide training support to [TaSM] on all components of the ATEC certified shelters, to include construction, installation, repair, and troubleshooting.  Training support provided shall ensure that the contractor is able to fully assemble the shelters and that they operate as required.  Training shall be provided to TaSM personnel at Dublin, VA and once at Camp Buehring, Kuwait.

SOW ¶ 2.5 – "Detailed Requirements – Documentation and Manuals" provides:

> [JCBAS] shall provide manuals, guides, and documentation as required by the contract, and shall update all manuals related to the systems listed above in the SOW.  [JCBAS] shall deliver all the technical and operational manuals for the shelters and associated equipment to TaSM, and if requested after the period of performance, directly to the customer.  See section 3 below.

SOW ¶ 2.6 – "Detailed Requirements – Warranties" provides:

> Warranties shall be provided by [JCBAS], in accordance with the subcontract between

[TaSM] and [JCBAS]. Warranties shall be to both [TaSM] and [TaSM]'s customer.

[JCBAS] shall provide a point of contact for all warranty claims. Commercial warranties for all shelter components shall commence from the date of Government acceptance of shelters. Government acceptance will occur when all shelters are assembled, final inspected, and operate as required.

SOW ¶ 3.4 – "Shelter Guide" provides:

[JCBAS] shall provide a Shelter Guide that details how to setup, disassemble, and package shelters for transportation to another location.  As a minimum, the guide shall address relative times for set-up and disassembly, labor requirements, specialized tools required and the method for repackaging and shipping.  The guide shall also detail any routine maintenance actions required and how to repair/troubleshoot/replace components. Additionally, the Shelter Guide shall include a list of recommended commercial item spares, corresponding part numbers, and where the commercial item spares may be purchased. [JCBAS] shall provide a shelter guide to [TaSM] as described in section 3 above, and shall include a shelter guide for each individual unit, in paper form as part of the packaging in section 2.1.5 above.

SOW ¶ 3.5 – "Shelter Specifications" provides:

[JCBAS] shall provide a Shelter Specification that details the structure dimensions, component sizes, location and sizes of entrances, weight, load capacity, electrical capacity, wiring diagrams, location of outlets, parts list, schematic and other technical details including but not limited to ECU manufacturer specifications and manuals, power interfaces, PV specifications and other major components.

PWS § 1.2 – "Objective" provides in relevant part:

The replacement of soft walled shelters with highly insulated rigid walled shelters that are soldier erectable, re-deployable, equipped with energy efficient ECUs, and LED lighting will greatly improve energy efficiency.

PWS § 2.0 – "Applicable Documents" provides in relevant part:

Material and electrical installation shall be in accordance with manufacturer's recommendations and latest revision of the following codes, standards, manuals and specifications, except where more stringent requirements have been specified herein:

                \*       \*       \*       \*       \*

- American Society for Testing and Materials (ASTM) International, ASTM-E1925-10, Specification for Engineering and Design Criteria for Rigid Wall Relocatable Structures (www.astm.org)[31]

---

[31] The ASTM requires that assembly of the shelters "shall be accomplished within two man-hours per 150 square feet of floor space"; and that there be no "special tools," which are "tools other than common hand tools or those

PWS § 3.3.4 – "Design Flexibility" provides in relevant part:

>   Shelters shall be portable, modular and allow for rapid assembly/disassembly using a minimal set of tools and come with a Shelter Guide (see PWS paragraph 4.2.3, below).

PWS § 3.3.4 – "Water Mitigation" provides in relevant part:

>   The roofing system and sides shall be water tight and be capable of shedding water to the exterior of the structure, allowing for runoff.

PWS § 3.3.4 – "Shelter Guide" provides:

>   The contractor shall provide a Shelter Guide in English that details how to setup, disassemble, and package shelters for transportation to another location.  As a minimum, the guide shall address relative times for set-up and disassembly, labor requirements, specialized tools required and the method for repackaging and shipping.  The guide shall also detail any routine maintenance actions required and how to repair/troubleshoot/replace components.  Additionally, the Shelter Guide shall include a list of recommended commercial item spares, corresponding part numbers, and where the commercial item spares may be purchased.

Technical Proposal – "Executive Summary" provides in relevant part:

>   The MEES system proposed by TaSM is a full kit composed of 5 1/2" thick wall, floor and roof panels. The panels are composed of 22ga steel stud, non-bridging ribs bonded to high density BASF Neopor® Expanded Polystyrene (EPS) sandwiched between a PVC cladded, 24ga 50ksi, G90 steel outer layer giving the walls, roof and floors an R-25.
>
>                     *        *        *        *        *
>
>   To ensure continuous shelter installation at Camp Buehring and to comply with the time line requirements of this solicitation, TaSM will have containers available at the production site and these containers will be loaded with the two-story shelters each day, each week shipping off the week's production.  TaSM will have three Kuwait based assembly crews available.

Technical Proposal – "Introduction" provides in relevant part:

>   Table 2 below highlights those areas where the TaSM MEES performance exceeds the KEEP PWS requirements.

Table 2:  PWS Requirements the MEES Exceeds

| PWS Requirement | MEES Performance |
|---|---|
| **Shelter** | |
| Shelters shall have a minimum thermal | The MEES walls, floors, and roof are |

---

designed specifically for use with a delivered product," or "equipment required to erect or strike" the shelters.  Pl. Ex. 2.

| efficiency of R-18 (floor), R-22 (walls) and R-25 (roof). | composed of 5 1/2" thick panels with an **R value of 25**. This provides a 15% improvement in overall thermal efficiency which translates into increased overall energy savings. The unique panel structure which **eliminates thermal bridging** across the panel and the use of shiplap panel joints provides superior thermal efficiency. **Non-thermal degrading EPS** is a superior insulating material. |
|---|---|
| Exterior walls of the shelter shall have at least a one hour fire rating. | The MEES exterior walls are **one-hour fire rated, independent laboratory tested** compliant to the complete battery of ASTM E119 standard for **one hour fire rating for a wall under load**. The MEES walls were tested compliant under an applied load of 16,704 pounds (1,392 lbs./linear foot) and further subjected to **30psi hose stream**. |

Technical Proposal § 1.1 – "Structure and Design Flexibility – Materials" provides in relevant part:

The MEES 5 ½" thick floor, roof, and wall (R25) panels are composed of structural grade G90 steel frame members with a Neopor® expanded polystyrene (EPS) core. Each panel is assembled using a technique that bonds the steel stud to the Neopor EPS. The unique method of bonding allows for the structural steel members to provide strength without passing all the way through the inside surface to the outside surface (See Figure 2) eliminating a thermal bridge. The interior and exterior of the panel is a 26ga, 50 ksi steel skin covered with a bonded UV protected PVC coating which provides a color embedded, robust weatherproof and durable protection. Panel joints are covered with VentureClad, a UL listed, multi-layered, zero permeability vapor barrier, resistant UV and extreme environmental conditions.

*       *       *       *       *

Table 3:  MEES Material Specifications

| MEES Material Specifications | |
|---|---|
| **Panels** | Exterior Wall:  3' 1-9/16" x 8'6"x 5 ¾", R-25, one hour fire rated; Type II non-combustible <br> Interior Wall:  R25, Type II con-combustible <br> Floor:  3' 9" x 7' 3-5/8" x 5 ½", R-25, Type II non-combustible <br> Roof:  3' 9" x 7' 3-5/8" x 5 ½", R-25, Type II non-combustible |
| **Panel Construction** | G90 structural member, non-thermal bridging, 18-5/16" o.c. bonded to Neopor® EPS.  5.5" panel thickness (see Figure 2).  Skin (panel covering) is 26ga 50 ksi G90 galvanized steel sheet with 6 mil thick PVC bonded cladding in Desert Tan 33446 (exterior) and 6 mil on |

|  | the interior surface except for the interior surface of floor panels. |
| --- | --- |

Technical Proposal § 3.1 – "Schedule – MEES Installation" provides:

The MEES concept is to provide easy installation by unskilled personnel.  TaSM's plan is to erect a two-story building every three (3) days utilizing a four (4) person crew.  The installation crew will consist of three (3) low level workers and one (1) more experienced worker to ensure the installation procedures are followed and the installation meets the construction requirement.

In addition, TaSM will provide a two (2) person supervisor crew whose responsibility will be to unload the shelters from the truck when it arrives, stage the required materials in order of assembly, and transport the materials form [sic] the staging to the installation areas.  TaSM will have a site lead to ensure everything is proceeding according to schedule and provide necessary assistance to the crews as required.  One of the other requirements for the site lead will be communication with the customer on site as required.

This staffing structure will ensure that all two-story shelters will be erected during the timeframe of the contract.  TaSM leadership has extensive experience in utilizing local nationals (LNs) or third country nationals (TCNs) as installation crews.  TaSM is familiar with the process of getting LNs and TCNs on the site at Camp Buehring and will ensure that the crews are on site six (6) days a week.

Additional information on project schedule specifics including production, transportation, and MEESs erection is illustrated in Section 3.4 of this proposal.

Technical Proposal § 3.2 – "Schedule – Transportation" provides:

TaSM will ship seven (7) two-story buildings from the production facility to Camp Buehring Kuwait every week starting approximately sixty (60) days after award of contract.  Each shelter will ship via ground from the production facility to the port of Norfolk, VA in 40 ft. ISO containers.  Each two-story shelter will be packaged into two (2) containers; one container will store the wall and ceiling panels.  The second container will transport the raised base, stairways, HVAC system, and the electrical components. From Norfolk, VA the containers will be shipped via U.S. flagship to Kuwait.  Customs in Kuwait will be handled by our transportation subcontractor who will work with Kuwaiti Customs agents to ensure timely release of the shipments.  From Customs the units will be transported via truck to Camp Buehring where the containers will be off-loaded at the lay down yard and will be unpacked by our logistics team on-site.

The logistics team on-site at Camp Buehring will be responsible for tracking all of the units and will transport the required items to the pad for each day of assembly.

49

Technical Proposal § 3.4.2 – "Schedule – Transportation Schedule" provides:

To ensure continuous shelter installation at Camp Buehring and to comply with the time line requirements of this solicitation, TaSM will ship seven (7) two-story shelters, fourteen (14) ISO containers, weekly via U.S. flagship.  Transportation from the production facility to Camp Buehring, including all customs clearance, will take approximately forty (40) days per shipment.

Technical Proposal § 3.4.3 – "Schedule – MEES Installation Schedule" provides:

TaSM will have two (2) supervisors who unload the shelter equipment, stage the pad, and manage the installation teams.  There will be three (3) four (4) person installation teams who will assemble one (1) two-story shelter in approximately three (3) days.  CFT and PVT will be completed concurrently and immediately following assembly and completion of a shelter or group of shelters.

Technical Proposal – "Kuwait Shelter Assembly" (in response to "Evaluation Notice (EN) 1: T3-01") provides in relevant part:

TaSM's team has the ability to expedite their schedule significantly by addressing the following components of the overall schedule:
- Production Capability
- Kuwait Shelter Assembly

Production Capability
The production facility, located in Radford, VA, has dedicated half of their total production capacity to the Army KEEP shelters.  During the normal 40 hour work week, the Projection KEEP line can produce up to eight (8) two-story shelters. . . .

However, the production output can easily be increased to a maximum of twenty-four (24) two-story shelters per week.  This will be achieved by the addition of two (2) more shifts per day.

Additional capacity can further be expanded by utilizing the remaining (com

\*       \*       \*       \*       \*

Kuwait Shelter Assembly
TaSM has validated that an adequate assembly labor pool exists in Kuwait to meet either production schedules [sic].  In order to accommodate the production schedule of twenty-four (24) two-story shelters per week, TaSM will start with six (6) assembly teams for the first set of twenty-four (23) units.  TaSM will increase the number of assembly teams to eight (8) to accommodate the assembly of the second set of twenty-four (24) units and will increase the number of assembly teams to ten (10) to complete the project.